**UNITED STATES of America, Appellant,**

v.

**SOUTH FLORIDA ASPHALT COMPANY et al., Appellees.**

No. 19635.

United States Court of Appeals
Fifth Circuit.

March 26, 1964.

Rehearing Denied June 10, 1964.

See also, 5 Cir., 329 F.2d 868.

Patrick M. Ryan, Atty., Dept. of Justice, Washington, D. C., Edward F. Boardman, U. S. Atty., Miami, Fla., for appellant.

Robert W. Rust, Thomas H. Anderson, Earl Waldin, Jr., Miami, Fla., Harrison D. Griffin, Fort Lauderdale, Fla., for appellees.

Before TUTTLE, Chief Judge, and WISDOM and GEWIN, Circuit Judges.

GEWIN, Circuit Judge.

This is an appeal by the Government from the dismissal of an information charging the defendants with engaging in a combination and conspiracy in restraint of interstate and foreign trade and commerce in the sale and distribution of "hot mix asphalt" and other materials used in road paving in violation of the Sherman Act[1] and the Clayton Act.[2]

The information alleged that the three corporate defendants are Florida Companies, referred to as "asphalt suppliers", engaged in the manufacture, sale and distribution of hot mix asphalt and other paving materials. The individual defendants are officers of the three corporations. The paving or asphalt materials are composed of rock, sand, and bitumen, the latter being a by-product obtained in refining crude oil. The bitumen used by the defendants is produced in Venezuela and other places outside of Florida, shipped into Florida by ocean tankers, and emptied into temporary storage vats to await delivery to "asphalt suppliers" such as the defendants. The temporary storage vats are owned and operated by the producers of the bitumen or their terminal agents. The bitumen is owned by the out-of-state producers until sold to the "asphalt suppliers".

Because the sufficiency of the allegations of the information are under attack, we consider it necessary to quote substantial portions of the information:

"7. Asphalt suppliers in the Broward County area are engaged in the manufacture of hot mix asphalt and the sale and distribution of hot mix asphalt and other asphalt materials to paving contractors and

---

1. 15 U.S.C. § 1.

2. 15 U.S.C. § 24.

other purchasers in the Broward County area. In addition to the manufacture and sale of asphalt materials, most of the asphalt suppliers in the Broward County area offer asphalt materials laid in place and perform this service as sub-contractors to paving contractors, and make a charge and obtain a profit both from the sale of said asphalt materials and from their services in laying the materials in place.

"8. More than 95% of all bitumen purchased by said asphalt suppliers is purchased directly from producers and refiners of petroleum products located in Venezuela and States other than the State of Florida and is transported in interstate and foreign commerce to said asphalt suppliers through temporary storage facilities at deep-water ports along the Florida coast, particularly Port Everglades, Florida, which temporary storage facilities are owned and operated by said producers and refiners or by their terminal agents.

"9. The remainder of the asphalt materials purchased by said asphalt suppliers is obtained from one or more wholesale distributors doing business within or in the vicinity of the Broward County area who purchase asphalt materials from the aforesaid foreign and out-of-State sources for sale to said asphalt suppliers and other customers.

"10. The transportation and handling of bitumen and most asphalt materials require that such products be maintained at a high temperature so as to maintain them in a liquid state. Bitumen is transported from the aforesaid out-of-State sources into Florida by specially equipped ocean-going tankers which are heated by steam coils to keep the asphalt at a high temperature. Tanker loads of bitumen are regularly scheduled for shipment and delivery every four to six weeks to the aforesaid deep-water ports in Florida. When the bitumen is delivered to the aforesaid temporary storage facilities, it is pumped from the tankers into specially heated tanks for delivery to asphalt suppliers and other customers. The asphalt is then transported from said facilities in trucks provided by common carriers or by customers, including defendant asphalt suppliers.

"11. In connection with the awarding of contracts and in response to purchase orders from awarding authorities to supply asphalt materials for large public and private paving projects in the Broward County area, agents of the petroleum companies or their wholesale distributors regularly contact the asphalt suppliers to whom such contracts are awarded or with whom such purchase orders are placed for the purpose of soliciting or otherwise obtaining orders, understandings, or commitments to purchase the bitumen required by such projects. Said understandings or commitments include a determination of the quantity of bitumen needed to complete the project and the construction timetable in order to schedule shipments and deliveries of bitumen in sufficient quantity to meet the future requirements of such asphalt suppliers.

"12. Thus, substantial quantities of bitumen are sold and shipped by producers and refiners thereof from sources in Venezuela and States other than the State of Florida in direct response to orders, understandings, or commitments by asphalt suppliers to purchase bitumen in connection with specific paving projects in the Broward County area.

"13. In addition to the substantial quantities of bitumen shipped in interstate and foreign commerce in connection with the performance of large specific paving projects, the

remaining quantity of bitumen shipped into the Broward County area from sources without the State of Florida is based on anticipation of current supplier demand, orders to be received, and sales to be made.

"14. Thus, defendant asphalt suppliers act as conduits through which bitumen flows in a continuous uniterrupted [sic] stream in foreign and interstate commerce from points of origin in Venezuela and States other than Florida to its final use in paving surfaces in the Broward County area.

"15. In the period of time from January 1, 1958 to June 1, 1961, the value of bitumen sold in the Broward County area was approximately $2,168,231.76. Of this total amount, approximately $1,839,569.75 or 85% was purchased by defendant and co-conspirator asphalt suppliers.

"16. Substantially all asphalt materials sold in the Broward County area are supplied by four asphalt suppliers: South Florida Asphalt Company, East Coast Asphalt Corp., R. H. Wright, Inc., and Weekley Asphalt Co., Inc. of Hallandale, Florida. The value of asphalt materials sold by said companies in the Broward County area exceeded $3,300,000 in the year 1960. Of this total amount, approximately $3,000,000 or 90% was sold by the three defendant asphalt suppliers.

V

OFFENSE CHARGED

"17. Beginning in or about August 1959, the exact date being unknown, and continuing thereafter up to and including the date of the filing of this Information, the defendants and co-conspirators have engaged in a combination and conspiracy in unreasonable restraint of the hereinbefore-described interstate and foreign trade and commerce in the sale and distribution of asphalt materials, in violation of Section 1 of the Act of Congress of July 2, 1890, entitled 'An Act to protect trade and commerce against unlawful restraints and monopolies', c. 647, 26 Stat. 209 (15 U.S.C. § 1), as amended, commonly known as the Sherman Act.

"18. The aforesaid combination and conspiracy has consisted of a continuing agreement and concert of action among the defendants and co-conspirators, the substantial terms of which have been and are that they agree:

"(a) To raise, fix, stabilize, and maintain prices at which hot mix asphalt and other asphalt materials are sold to paving contractors in the Broward County area; and

"(b) To raise, fix, stabilize, and maintain prices at which hot mix asphalt and other asphalt materials are sold to State, county, and local governmental awarding authorities for use in the Broward County area.

"19. During the period of time covered by Count One of this Information and for the purpose of forming and effectuating the aforesaid combination and conspiracy, the defendants and co-conspirators, by agreement and concert of action, have done those things which, as hereinbefore charged, they conspired and agreed to do, including, among other things, the following:

"(a) During September 1959, defendants and co-conspirators met together and agreed to increase the price of asphalt materials to paving contractors and other customers in the Broward County area to uniform levels, effective October 1, 1959;

"(b) Pursuant to the aforesaid agreement, referred to in paragraph 19(a) above, defendants notified paving contractors and other customers in the Broward County area by letters on September 20, 1959 through September 24, 1959, that effective October 1, 1959, the price of asphalt would be $8.25 per ton f. o. b. plant less a cash discount of 25c per ton

if paid on or before the 10th of the month following purchase;

"(c) Thereafter, pursuant to the aforesaid agreement referred to in paragraph 19(a) above, defendants issued to paving contractors and other customers in the Broward County area copies of a common price list quoting identical prices and terms and conditions for the sale of various quantities and thicknesses of machine-laid asphalt, together with identical prices for prime and sand; and

"(d) Thereafter, during August 1960, defendants and co-conspirators met together and designated defendant R. H. Wright, Inc., as the supplier to submit the low bid to supply the asphalt requirements of Broward County, Florida, for the contract period September 1960 to September 1961, determined the price to be quoted by defendant R. H. Wright, Inc., and agreed that defendant East Coast Asphalt Corp. and South Florida Asphalt Company, and other co-conspirator suppliers, were to submit price quotations to Broward County higher than that to be quoted by R. H. Wright, Inc.

## VI
### EFFECTS

"20. The effects of the aforesaid combination and conspiracy have been and are to unreasonably restrain the hereinbefore-described commerce in the sale and distribution of asphalt materials in the Broward County area by:

"(a) Increasing the prices of asphalt materials sold and distributed therein; and

"(b) Suppressing and eliminating price competition among the defendant asphalt suppliers in the sale and distribution of asphalt materials."

Certain individuals, who are officers of the corporations, were made defendants under Count One of the information, and were also charged in Count Two pursuant to the Clayton Act. The United States asserts that these allegations adequately charged the interstate nature of the commerce under each of two theories (1) the sales by the appellees are themselves alleged to be in the flow of commerce; and (2) the sales by appellees resulting from the alleged illegal combination are charged to affect interstate commerce by an illegal restraint on the sales even if they be "local" sales.

The District Court did not write an opinion, or assign specific reasons for its order, but the "order of dismissal" stated:

*"Ordered and Adjudged* that the several motions to dismiss for failure to allege a restraint of interstate or foreign commerce, and no others, are hereby granted * * *"

At the hearing, upon announcing that he was about to grant the motion, the court stated to the parties: "Why don't you and the Government sit down and dictate an order . . . You may put in what I have stated about the basic reasons." From an examination of the transcript of the short hearing, it is apparent that the deficiency in the information as ascertained by the District Court was two-fold: First, the failure to state positively that the defendants, all of whom admittedly do only intrastate business, "ordered" the bitumen from the out-of-state shipper; and secondly, in the absence of an "order" for the shipment into the state, there is nothing in the information to support a continued "flow" of commerce in view of the fact that the bitumen was deposited in storage tanks immediately upon coming into the state and was not sold or delivered directly to the defendants. In the course of the hearing, the court made the following comments:

"The Court: Let me just say this: All goods are shipped in anticipation of demand, or all stocks are made in anticipation of demand. So any anticipation of demand does not help us any."

* * *

"The Court: More than that. A prior order is a direct order to bring

about something. In other words, I order from you a suit of clothes and we make a contract, and then you would have to bring the suit of clothes from somewhere, from underneath the sewing machine or wherever."

\* \* \*

"The Court: Down here we have continuity of movement of so many materials that they practically involve everything from desks to toothpicks, and so forth. Continuity to me means nothing unless it is a continuity within the scope of the accused."

\* \* \*

"The Court: And certainly it had come to rest. They had no control. Those big oil companies wouldn't even look at these little contractors so far as 'control' is concerned. They are insignificant."

\* \* \*

"The Court: I say they were inconsequential. They have no control over that flow, in my opinion."

\* \* \*

" \* \* \* And if there are orders here, as I have told you long ago, there would be no problem in this case, none whatsoever.

"Mr. Whitley: Well, I contend that there are orders charged here, Your Honor.

"The Court: I don't believe so.

"Mr. Whitley: I feel that there are orders charged there—

"The Court: I don't believe so because I don't think there were orders, just having a general knowledge of how this business goes. \* \* \* "

\* \* \*

"The Court: But, as I say, I don't think that has anything to do with the question before us. It isn't a prior order. \* \* \* "

\* \* \*

"The Court: I cannot rest my own product and get out of interstate commerce. But you can rest it. If

I buy from you and it comes to rest in your hands, that is something else \* \* \* "

\* \* \*

"In this case I just think there was no uninterrupted flow of commerce, and there was no commerce controlled by the defendants."

■■ On consideration of a motion to dismiss, all well pleaded facts are taken to be true; and if the same constitute a criminal offense, the information is good and must not be dismissed. Accordingly, we must ultimately determine whether the information sufficiently charged that the bitumen was transported into the State of Florida in response to orders, commitments, or understandings by the defendants in such fashion as to constitute a "continued flow of commerce". We conclude that the information was sufficient as a matter of law.

There are allegations of shipments in response to "orders, understandings, or commitments" and shipments based on "anticipation of supplier demand." The Supreme Court recognized in Walling v. Jacksonville Paper Co., 317 U.S. 564, 63 S.Ct. 332, 87 L.Ed. 460 (1943) that a situation could arise where shipments made in "anticipation of needs of specific customers, rather than on prior orders or contracts, might \* \* \* be sufficient to establish that practical continuity in transit necessary to keep a movement of goods 'in commerce' \* \* \*. We do not believe, however, that on this phase of the case such a course of business is revealed by the record." Clearly, such a course of business is charged in the instant case, and the Government should have been given an opportunity to prove it. In United States v. Chrysler Corp. Parts Wholesalers, et al., 180 F.2d 557 (9 Cir. 1950), the court concluded that in determining the sufficiency of an allegation that goods were shipped "in anticipation" of demands, the four corners of the indictment should be examined:

"The goods procured 'in anticipation of' orders and demands, however, might fall short of the continuity of movement necessary to keep them in

interstate commerce. We look, therefore, to other allegations to determine whether there appears some other basis on which the alleged conspiracy relating to these alleged transactions is brought within the scope of the Sherman Act.

"It is well established that the commerce power of Congress, and the Sherman Act, which is a complete exercise of that power, extends to intrastate transactions which substantially affect interstate commerce. Mandeville Island Farms, Inc. v. American Crystal Sugar Co., 334 U.S. 219, 68 S.Ct. 996, 92 L.Ed. 1328. We think that paragraph 21(c) of the indictment sufficiently alleges that the alleged price fixing conspiracy in its entirety had a substantial effect on interstate commerce within the scope of the Sherman Act. The allegation is not, as appellees urge, a mere conclusion of law, for it incorporates and specifies particular acts which are alleged to bring about the substantial effect. Restraints on retail sales of goods within a state which were purchased outside the state have been held to so affect interstate commerce as to be within the scope of the commerce power and the Sherman Act. United States v. General Motors, 7 Cir., 121 F.2d 376, 401–402; cf., N.L.R.B. v. Van DeKamp's, 9 Cir., 152 F.2d 818. 'The control of the handling, the sales and the prices at the place of origin * * * or in the state of destination * * * may operate directly to restrain and monopolize interstate commerce.' Local 167 v. United States, 291 U.S. 293, 297, 54 S.Ct. 396, 398, 78 L.Ed. 804. The allegations are sufficient."

In our opinion the information under consideration sufficiently alleged that the bitumen was shipped with a definite knowledge and understanding on the part of the producers that the defendants would purchase the same, the approximate amount that would be purchased, and approximately when such purchases would take place. Even if such ship-ments were not in response to direct orders from the defendants, the arrangements and understandings alleged were sufficient.

Not having the benefit of an opinion by the District Court, we are not sure what significance, if any, he actually placed on the fact that the bitumen was transferred from the tanker to the storage tanks rather than directly to the defendants. At any rate, the defendants strongly urge upon us that this constitutes a break in the flow of commerce, and that the statement that the defendants "act as conduits through which bitumen flows in a continued uninterrupted stream in foreign and interstate commerce from [various places] to its final use in paving surfaces in the Broward County area", is a mere conclusion of the pleader and cannot suffice to bridge the gap. In answering this very same contention, the Ninth Circuit in United States v. Chrysler, supra, held, "Taken with other allegations we think it is a statement of an ultimate fact." In United States v. Employing Plasterer's Assn., 347 U.S. 186, 74 S.Ct. 452, 456, 98 L.Ed. 618 (1954), a civil action for violations of the Sherman Act, the Supreme Court held:

"The District Court did not question that the foregoing and other factual allegations showed a combination to restrain competition among Chicago plastering contractors. But the court considered these allegations to be 'wholly a charge of local restraint and monopoly,' not reached by the Sherman Act. And the court held that there was no allegation of fact which showed that these powerful local restraints had a sufficiently adverse effect on the flow of plastering materials into Illinois. At this point we disagree. The complaint plainly charged several times that the effect of all these local restraints was to restrain interstate commerce. Whether these charges be called 'allegations of fact' or 'mere conclusions of the pleader,' we hold that they must be taken into account in

deciding whether the Government is entitled to have its case tried."

The Supreme Court said in Walling v. Jacksonville Paper Co., supra:

"* * * The entry of the goods into the warehouse interrupts but does not necessarily terminate their interstate journey. A temporary pause in their transit does not mean that they are no longer 'in commerce' within the meaning of the Act. As in the case of an agency (cf. De Loach v. Crowley's Inc., (CC A 5th) 128 F.2d 378) if the halt in the movement of the goods is a convenient intermediate step in the process of getting them to their final destinations, they remain 'in commerce' until they reach those points. Then there is a practical continuity of movement of the goods until they reach the customers for whom they are intended. That is sufficient. Any other test would allow formalities to conceal the continuous nature of the interstate transit which constitutes commerce."

■ Finally, the defendants argue that the combination and conspiracy charged is one in which they have allegedly agreed to unlawfully control only the local commerce in asphalt materials or paving materials while the only item alleged to have been shipped in interstate commerce is bitumen, a mere component of asphalt or paving materials. Although not decisive on this issue, the fact that (1) the defendants purchase 85% of the bitumen sold in the Broward County area, all of which had been in interstate commerce; and (2) the defendants sell approximately 90% of the asphalt materials sold in the Broward County area, is very important. Anyone in the area who must purchase paving materials or "hot mix asphalt" will likely be required to (1) purchase a mixture, one of the vital components of which has been in interstate commerce; and (2) make the purchase from one of defendant-conspirators. We cannot agree that no effect on interstate commerce has been charged simply because the product sold by the defendants is a manufactured product which, though composed of materials that have been in interstate commerce, is itself sold only locally. For a very thorough survey of the problems presented by considerations of local manufacture and intrastate commerce versus interstate commerce, see Mandeville Island Farms v. American Crystal Sugar Co., 334 U.S. 219, 68 S.Ct. 996, 92 L.Ed. 1328 (1948). After discussing the early cases, most of which have been overruled, and some of which the appellees strongly urge upon us in this appeal, the Supreme Court there stated:

"In view of this evolution, the inquiry whether the restraint occurs in one phase or another, interstate or intrastate, of the total economic process is now merely a preliminary step, except for those situations in which no aspect of or substantial effect upon interstate commerce can be found in the sum of the facts presented. For, given a restraint of the type forbidden by the Act, though arising in the course of intrastate or local activities, and a showing of actual or threatened effect upon interstate commerce, the vital question becomes whether the effect is sufficiently substantial and adverse to Congress' paramount policy declared in the Act's terms to constitute a forbidden consequence. If so, the restraint must fall * * *."

When we look to the four corners of the information, as was done in Chrysler, supra, the phrase "herein-before-described commerce" has reference to interstate commerce. The bitumen that is used in the Broward County area has unquestionably been in interstate commerce. If the allegations of the complaint are proven, the alleged acts of the appellees will have had an adverse effect on such commerce.

When enacting the Sherman and Clayton Acts, the Congress intended "* * * to go to the utmost extent of its constitutional power in restraining trust and monopoly agreements * * *." United States v. South-Eastern Underwriters Assoc., 322 U.S. 533, 558 (1944),

64 S.Ct. 1162, 1176, 88 L.Ed. 1440. See also Report of the Attorney General's National Committee to Study the Antitrust Laws, March 31, 1955. The power exercised by Congress with respect to trusts and monopolies is comparable to its exercise of the same power in passing the National Labor Relations Act, and with respect to both types of legislation there is little question but that Congress exercised the maximum constitutional breadth permissible under the commerce clause.[3]

It is the opinion of this Court that the information taken as a whole sufficiently charges violations of the Sherman Act.

The judgment is reversed.

---

3. See N. L. R. B. v. Reliance Fuel Oil Corp., 371 U.S. 224, 83 S.Ct. 312, 9 L. Ed.2d 279:
"This Court has consistently declared that in passing the National Labor Relations Act, Congress intended to and did vest in the Board the fullest *jurisdictional* breadth constitutionally permissible under the Commerce Clause. See, e. g., Guss v. Utah Labor Relations Board, 353 U.S. 1, 3 [77 S.Ct. 598, 599, 1 L.Ed.2d 601]; Polish National Alliance of United States of North America v. [National] Labor Relations Board, 322 U.S. 643, 647-648 [64 S.Ct. 1196, 1198-1199, 88 L.Ed. 1509]; National Labor Relations Board v. Fainblatt, 306 U.S. 601, 607 [307 U.S. 609, 59 S.Ct. 668, 672, 83 L.Ed. 1014]. Compare Weber v. Anheuser-Busch, Inc.,

348 U.S. 468, 480 [75 S.Ct. 480, 487, 99 L.Ed. 546]. The Act establishes a framework within which the Board is to determine 'whether proscribed practices would in particular situations adversely affect commerce when judged by the full reach of the constitutional power of Congress. Whether or no practices may be deemed by Congress to affect interstate commerce is not to be determined by confining judgment to the quantitative effect of the activities immediately before the Board. Appropriate for judgment is the fact that the immediate situation is representative of many others throughout the country, the total incidence of which if left unchecked may well become far-reaching in its harm to commerce.' "