**UNITED STATES of America**

v.

**NEW ORLEANS CHAPTER, ASSOCIAT-
ED GENERAL CONTRACTORS OF
AMERICA, INC., et al.**

Crim. A. No. 29371, Division B.

United States District Court
E. D. Louisiana,
New Orleans Division.

Dec. 16, 1964.

On Motion for Reconsideration
Feb. 17, 1965.

274

Louis C. LaCour, U. S. Atty., Walter F. Gemeinhardt, First Asst. U. S. Atty., New Orleans, La., Charles M. Beckler, Barton Veret, Arthur A. Feiveson, Barry J. Waldman, Antitrust Division, Dept. of Justice, Washington, D. C., for the Government.

R. Emmett Kerrigan, Francis G. Weller, Deutsch, Kerrigan & Stiles, New Orleans, La., George Wise, Hogan & Hartson, Washington, D. C., for defendants.

FRANK B. ELLIS, District Judge.

The New Orleans Chapter, Associated General Contractors of America, Inc., a trade association of general contractors operating in New Orleans, and six individuals associated with general contractor members of the Association were here indicted January 18, 1964, for alleged violations of the Sherman "Anti-trust" Act, 15 U.S.C.A. § 1. The gist of the charge is that defendants combined to advocate, use and implement a "single bid" system when competing for general contracting work in the New Orleans metropolitan area.

Pleas of not guilty were entered as to all defendants at arraignment February 19, 1964, and an additional 90 days were granted for the filing of special pleadings. In due course defendants moved to dismiss on two grounds, first, that the indictment does not state facts sufficient to constitute an offense against the United States, and, secondly, that the grand jury returning the indictment was not properly constituted or lawfully selected. This motion is now before the Court.

### I.  Sufficiency of the Indictment

The general test to be applied in determining the sufficiency of an indictment is that set forth by the Supreme Court in Russell v. United States, 369 U. S. 749, 82 S.Ct. 1038, 8 L.Ed.2d 240 (1962):

> "[F]irst, whether the indictment 'contains the elements of the offense intended to be charged, "and sufficiently apprises the defendant of what he must be prepared to meet"', and, secondly, ' "in case any other proceedings are taken against him for a similar offense whether the record shows with accuracy to what extent he may plead a former acquittal or conviction." ' " (Citations omitted) 369 U.S. at 763–764, 82 S.Ct. at 1047. See also United States v. Smith, 228 F.Supp. 345, 346 (E.D. La.1964); and United States v. Vogt, 230 F.Supp. 607, 609 (E.D.La. 1964).

The thrust of Defendants' argument here is that "the indictment fails to allege facts sufficient to establish an essential element of the offense charged, namely, a direct restraint or a direct and substantial adverse effect upon interstate commerce by the alleged combination and conspiracy."

While Rule 7(c) of the Federal Rules of Criminal Procedure, 18 U.S. C.A., requires a "plain, concise and definite written statement of the essential

facts constituting the offense charged," it is also clearly established that evidence need not be pleaded in an indictment. See Wilson v. United States, 158 F.2d 659, 663 (5 Cir. 1947), cert. den. 330 U.S. 850, 67 S.Ct. 1095, 91 L.Ed. 1294. The issue then is whether the indictment here sets forth sufficient "essential facts" regarding the effect of defendants' activities upon interstate commerce to enable defendants to prepare their defense and prevent double jeopardy.

■ It should be initially noted that in determining the sufficiency of an indictment charging a violation of the Sherman Act the indictment must be considered as a whole. United States v. New York Great Atlantic & Pacific Tea Co., Inc., 137 F.2d 459, 464 (5 Cir. 1943), cert. den. 320 U.S. 783, 64 S.Ct. 191, 88 L.Ed. 471; Local 36 of International Fishermen & Allied Workers of America v. United States, 177 F.2d 320, 326 (9 Cir. 1949), cert. den. 339 U.S. 947, 70 S.Ct. 801, 94 L.Ed. 1361. The indictment in this case refers to two types of interstate impact alleged to have resulted from defendants' activities, one being the effect on out-of-state contractors who submit bids on Louisiana projects, and the other regarding construction materials supplied by non-Louisiana manufacturers and distributors for construction projects here.

Paragraph eight [1] of the indictment indicates that bid invitations on Louisiana construction projects are frequently sent to contractors "who are located in states other than Louisiana", that substantial numbers of those contractors bid on such projects, and that some of those contractors "have been members of the defendant Association." The principal types of construction materials used are listed in paragraph nine,[2] together with a reference to the general trade practice of only ordering materials "after award of a contract or in anticipation of a specified need." Paragraph ten [3] then adds that substantial quantities of such materials are shipped interstate directly to the job sites in Louisiana or to other

1. "8. Invitations to submit competitive bids on building construction projects in the New Orleans metropolitan area frequently include contractors who are located in states other than Louisiana. A substantial number of general contractors and subcontractors located in states other than Louisiana engage in the business of bidding on and contracting for building projects, and of performing their services, in the State of Louisiana and particularly in the New Orleans metropolitan area. Some of those general contractors who are located in states other than Louisiana have been members of the defendant Association."

2. "9. The costs of building construction projects include, as a large portion thereof, the price for various building materials, equipment, and other products, including steel, stone, lumber, brick, tile, electrical controls, heating units, compressors and other special articles, which are contracted for, supplied, sold and installed by general contractors or subcontractors to whom contracts have been awarded. Contractors, including members of the defendant Association, do not customarily carry in stock quantities of such materials, equipment, or other products, sufficient for large construction projects. They order them,

after award of a contract or in anticipation of a specified need, from manufacturers or distributors."

3. "10. Substantial quantities of such materials, equipment and other products which are furnished and installed by subcontractors and general contractors, including members of the defendant Association, are shipped in interstate commerce by manufacturers or distributors located outside the State of Louisiana directly to job sites in Louisiana. Other such materials, equipment and products are shipped by manufacturers or distributors located outside the State of Louisiana to contractors, dealers, or owners of construction projects for delivery to job sites in Louisiana. Thus, there is a substantial continuous flow of materials, equipment and products used by contractors in Louisiana, including members of the defendant Association, in interstate commerce from plants or warehouses located outside the State of Louisiana to locations within that State. Any restraints or interference with building construction projects in the New Orleans metropolitan area necessarily and directly restrains and affects the interstate flow of such materials, equipment, and products into the State of Louisiana."

places for subsequent delivery to those job sites.

The alleged unlawful combination and conspiracy is set forth in paragraph twelve [4] and charges that defendants would boycott or refuse to submit competitive bids on building construction projects for which the owner or architect intended to accept, or in fact accepted, *separate bids* from individual sub-contractors. The Association's "Bidding Rule C" [5] advocates *single bids* for the entire project. Finally, paragraph fourteen [6] avers that defendants have thus obstructed free competition on building construction projects in the New Orleans metropolitan area and hence restrained interstate commerce.

In United States v. South Florida Asphalt Co., 329 F.2d 860 (5 Cir. 1964), cert. den. sub. nom. R. H. Wright, Inc. v. United States, 85 S.Ct. 149, several Florida "asphalt suppliers" regularly purchased, in Florida, an asphalt ingredient known as bitumen which had been imported mainly from South America. Defendants there challenged the sufficiency of the Sherman Act criminal charges against them alleging that their purchases of bitumen were not part of a "continued flow of commerce" and hence had no direct effect on interstate commerce. In reversing the district court's dismissal of the bill of information, which incidentally bears a striking resemblance in both form and content to the indictment in this case, the Court of Appeals held that specifications in the charge as to particular acts alleged to bring about the substantial effect on interstate commerce were sufficient to preclude the granting of defendants' motion to dismiss the charges and at least permit the government an opportunity to prove its case.

4. "12. The aforesaid combination and conspiracy has consisted of a continuing understanding and concert of action among the defendants and co-conspirators, substantial terms of which have been and are:

(a) That Bidding Rule C (set forth in paragraph 5(f) of this indictment) should be developed, adopted, promulgated and enforced by the Association;

(b) That the defendants and co-conspirators, jointly and severally should exert influence upon owners, architects, general contractors and subcontractors in the New Orleans metropolitan area to accept, support and abide by Bidding Rule C;

(c) That members of the Association should boycott and refuse to submit competitive bids on building construction projects for which the owner or architect intends to accept, or in fact accepts, separate bids from subcontractors; and

(d) That the Rules and Arbitration Committee for the Association should administer and police Bidding Rule C, for which purpose said Committee or its representatives should meet or correspond with owners, architects, general contractors and subcontractors in the New Orleans metropolitan area."

5. "C. *Work to Be Included*

"Competitive bids shall not be submitted on any project unless all of the items necessary to complete the job are in-

cluded in the bid on the general contract. All items entering into the general contractor's bid are to be based upon prices, costs and estimates solicited or otherwise obtained directly by the general contractor from the subcontractors or vendors involved. This Rule is intended to prohibit members from submitting competitive bids in cases where the owner or architect takes bids direct from one or more classifications or subcontractors."

6. "14. The aforesaid combination and conspiracy has had the following effects, among others:

(a) General contractors and subcontractors have been restrained and prevented from freely competing for contracts on building construction projects in the New Orleans metropolitan area;

(b) Public and private owners of building construction projects in the New Orleans metropolitan area have been deprived of the benefits of free competition for contracts on such projects;

(c) A private trade association has arbitrarily restricted owners, architects, general contractors and subcontractors in their freedom of doing business according to methods of their own choice;

(d) Interstate trade and commerce in the contracting business and in building materials, equipment and special products has been restrained."

"In our opinion the information under consideration sufficiently alleged that the bitumen was shipped with a definite knowledge and understanding on the part of the [foreign] producers that the defendants would purchase the same, the approximate amount that would be purchased, and approximately when such purchases would take place. Even if such shipments were not in response to direct orders from the defendants, the arrangements and understandings alleged were sufficient." 329 F.2d at 866.

The indictment here contains averments that orders for substantial quantities of construction materials were placed directly with out-of-state suppliers, and, in addition, that a "substantial number" of contractors located in states other than Louisiana bid on these projects.

■ The government stresses these fact allegations to establish the existence of transactions substantially affecting interstate commerce which could in turn be affected by any concerted attempt to control local bidding procedures. In that respect the averments parallel, at least in essential part, those in the South Florida Asphalt case and the government would here also be permitted to proceed. See United States v. Employing Plasterers' Ass'n, 347 U.S. 186, 189, 74 S.Ct. 452, 98 L.Ed. 618 (1954); and United States v. Employing Lathers Ass'n, 347 U.S. 198, 200, 74 S.Ct. 455, 98 L.Ed. 627 (1954). It is the opinion of this Court that the indictment taken as a whole sufficiently charges a violation of the Sherman Act, and the motion to dismiss on that ground is therefore denied.

II. *Legality of the Grand Jury*

Defendants have also moved to dismiss the indictment on grounds that the grand jury was not properly constituted or lawfully selected. In reply the government has moved to dismiss this motion, alleging that it was not timely filed.

■ The general rule for determining the timeliness of motions in criminal cases is set forth in Rule 12(b) (3)[7] and requires that the "motion shall be made before the plea is entered, but the court may permit it to be made within a reasonable time thereafter." The government's cross-motion could thus be disposed of summarily under the general rule by noting that at the time pleas were entered the Court granted an extension of time for the filing of motions and the motion was then filed within the time allowed.

The government contends further though that a special jurisprudential rule concerning timeliness has been enunciated by the Supreme Court when exception is taken to the competency of the grand jury. As stated in Agnew v. United States, 165 U.S. 36, 17 S.Ct. 235, 41 L.Ed. 624 (1897), that rule is:

"that the defendant must take the first opportunity in his power to make the objection. Where he is notified that his case is to be brought before the grand jury, he should proceed at once to take exception to its competency, for if he lies by until a bill is found, the exception may be too late * * *" 165 U.S. at 44, 17 S.Ct. at 238. See also Cook v. United States, 4 F.2d 517, 518 (5 Cir. 1925); and Michel v. Louisiana, 350 U.S. 91, 100, 76 S.Ct. 158, 100 L.Ed. 83 (1955).

The refusal to dismiss the charge in Agnew was premised on a waiver theory, that is, that the failure to immediately object implied a waiver of his right to challenge the grand jury.

■ Recent developments in the law indicate that a more strict examination of waivers in criminal cases is now required. "The classic definition of waiver enunciated in Johnson v. Zerbst, 304 U.S. 458, 464, 58 S.Ct. 1019, 82 L.Ed. 1461 * * * 'an intentional relinquishment or abandonment of a known right or privilege * * *'" was strongly reaffirmed in Fay v. Noia, 372 U.S. 391, 439, 83 S.Ct. 822, 849, 9 L.Ed.2d 837 (1963), and applied to a post-trial habeas

---

7. Federal Rules of Criminal Procedure, 18 U.S.C.A.

corpus petition challenging the legality of the grand jury in Cobb v. Balkcom, 339 F.2d 95 (5 Cir. 1964). The government here failed to prove that defendants knowingly and intentionally waived their right to challenge the grand jury. Hence, defendants' motion will not be dismissed, especially since it was made at an early stage in the proceedings.

■ After a careful examination of the applicable statutes, the affidavits and exhibits of record, the testimony of the witnesses and the authorities cited by counsel, this Court is of the opinion that the Jury Commissioner, Mr. Roy M. Watson, and the Clerk of Court, Honorable A. Dallam O'Brien, Jr., substantially complied with all the requirements of 28 U.S.C.A. § 1864[8] in selecting the grand jury. Furthermore, "(i)n the absence of individual prejudice" to the defendants, which has not here been shown, there is no justification for dismissing the indictment. Beatrice Foods Co. v. United States, 312 F.2d 29, 37 (8 Cir. 1963); cert. den. 373 U.S. 904, 83 S.Ct. 1289, 10 L.Ed.2d 199; Beck v. United States, 298 F.2d 622 (9 Cir. 1962) cert. den. 370 U.S. 919, 82 S.Ct. 1558, 8 L.Ed. 2d 499; Romney v. United States, 83 U.S.App.D.C. 150, 167 F.2d 521 (1948), cert. den. 334 U.S. 847, 68 S.Ct. 1512, 92 L.Ed. 1771. Thus, defendants' motion to dismiss the indictment on grounds that the grand jury was not properly constituted or lawfully selected must also be denied.

III. *Photographing and Fingerprinting*

■ Shortly after the indictment was returned and the natural defendants ap-

peared for preliminary hearing, they filed a "motion to be relieved from photographing and fingerprinting." Defendants pointed out first, that the charge against them under the Sherman Act is only a misdemeanor, not a felony, and secondly, that they are "life-long residents" of the community with "excellent reputations." This second point implies that photographing and fingerprinting would *per se* constitute punishment.

The general principles applicable to this question are set forth by Judges Learned Hand, Swan and Augustus Hand in United States v. Kelly, 55 F.2d 67, 83 A.L.R. 122 (2 Cir. 1932):

> "Fingerprinting seems to be no more than an extension of methods of identification long used in dealing with persons under arrest for real or supposed violations of the criminal laws. It is known to be a very certain means devised by modern science to reach the desired end, and has become especially important in a time when increased population and vast aggregations of people in urban centers have rendered the notoriety of the individual in the community no longer a ready means of identification." 55 F.2d at 69.

> "Such means for the identification of prisoners so that they may be apprehended in the event of escape, so that second offenders may be detected for purposes of proper sentence where conviction is had, and so that the government may be able to ascertain * * * whether the defendant has been previously con-

8. See 28 U.S.C.A. § 1864
"§ 1864. Manner of drawing; jury commissioners and their compensation
"The names of grand and petit jurors shall be publicly drawn from a box containing the names of not less than three hundred qualified persons at the time of each drawing.
The jury box shall from time to time be refilled by the clerk of court, or his deputy, and a jury commissioner, appointed by the court.
Such jury commissioner shall be a citizen of good standing, residing in the dis-

trict and a well known member of the principal political party in the district, opposing that to which the clerk, or his deputy then acting, may belong. He shall receive $5 per day for each day necessarily employed in the performance of his duties.
The jury commissioner and the clerk, or his deputy, shall alternately place one name in the jury box without reference to party affiliations, until the box shall contain at least 300 names or such larger number as the court determines.
This section shall not apply to the District of Columbia."

victed, are most important adjuncts of the enforcement of the criminal laws." 55 F.2d at 68.

The basis for the decision there to permit fingerprinting was the right of law enforcement authorities to employ fingerprinting as an appropriate and useful means to identify criminals and detect crime.

The crime charged in the Kelly case was possession of a quart of gin during prohibition, a misdemeanor. Defendant argued "that many of the statutes and the decisions in common-law states have allowed finger printing only in case of felonies."

The Court there reasoned to the contrary:

"(A)s a means of identification, it is just as useful and important where the offense is a misdemeanor, and we can see no basis for a differentiation." 55 F.2d at 70.

Likewise, this Court perceives no basis for engrafting an exception to the general rule when a misdemeanor under the Sherman Act is charged.

Defendants' second contention that fingerprinting and photographing constitute punishment in itself was expressly negated in United States v. Krapf, 285 F.2d 647 (3 Cir. 1961):

"Initially, it should be pointed out that fingerprinting is not a punishment. It is a means of identification which is useful in many circumstances some of which relate to the enforcement of our laws. Unless the burdens that this procedure places on the individual are unreasonable, therefore, it will be upheld as one of those annoyances that must be suffered for the common good." 285 F.2d at 650–651.

Based on the foregoing reasons and analysis, defendants' motion to be relieved from photographing and fingerprinting was denied.

IV. *Estoppel Against the Government*

In challenging the timeliness of defendants' motion excepting to the legality of the grand jury, the government introduced a letter dated December 30, 1963, from defendants' counsel addressed to Mr. William H. Orrick, Jr., Asst. Attorney General, Antitrust Division, U. S. Dept. of Justice, and directed to the attention of Charles L. Beckler, Esq., Attorney, Dept. of Justice, purporting to show that defendants had knowledge of the pending grand jury investigations. This letter cuts two ways however and also raises the question of estoppel against the government.

In pertinent part Mr. Kerrigan's letter states:

"I might add that it seems to us that the Government is being unnecessarily relentless in apparently seeking an indictment against many members of the New Orleans business community rather than exploring through frank discussion those policies of the Association to which your Department may have some objection.

"Furthermore, if there should be any direct disagreement as to the propriety of any particular Association procedure, certainly such questions are better resolved in the customary antitrust injunction suit, which appears to be the standard method of testing matters of first impression. This seems to be particularly so since *the Government made a thorough investigation of the Association ten or eleven years ago and made no complaint at that time about Bidding Rule C,* which requires that all items necessary to complete the job be included in the general contract, which seems to be the primary objective of your present inquiry before the Grand Jury." (Emphasis added.)

The truth of statements therein is considered admitted since the government filed the letter into evidence.

■■ The general rule is that the doctrine of estoppel is not applicable against the government in criminal matters. The rule admits, however, of an important exception.

"The government is estopped in the enforcement of criminal laws only by some sound public policy, such as when its officers have induced or lured the defendant into the commission of a criminal act." United State ex rel. Demarois v. Farrell, 87 F.2d 957, 962 (8 Cir. 1937), cert. den., Demarois v. Farrel, 302 U.S. 683, 58 S.Ct. 31, 82 L.Ed. 527; 31 C.J.S. Estoppel § 140c, p. 695.

The facts here show that the government had in fact examined the activities of the Association, including the use of "Bidding Rule C", which is now the basis for the alleged criminal violations of the antitrust laws. The antitrust laws are unchanged; the relevant part of the Sherman Act has not since been amended. And there was never any effort by the Association to conceal from anyone its "modus operandi" with reference to bidding procedures. The provision for "single bidding" has been in the Association's rules of procedure for better than a decade and was fully known to the government.

Here the government's acquiescence toward "Bidding Rule C" following its earlier examination of the Association induced defendants to continue using that same bidding procedure in the interim. Any allegation that the activity formerly approved is now considered criminal cannot be countenanced. The Court cannot refrain from the observation that this attitude by governmental departments and their officials could impair confidence on the part of our citizens and taxpayers in their public institutions. Such an attitude could undermine proper respect for the government when encouragement of that respect, in accordance with the proper principles of law, is one of the prime duties of the federal court. See Kemp v. United States, 38 F.Supp. 568, 571 (D.C.Md.1941).

The promotion of our citizens' confidence in the motives and activities of our public servants is a strong public policy which here dictates that the government be estopped from prosecuting these criminal charges against this group of reputable contractors who at all times conducted their bidding procedures with integrity and with due regard for the laws of the United States.

Consequently, it is ordered that this indictment be, and the same is hereby dismissed.

On Motion for Reconsideration

On February 3, 1965, this Court entertained a motion by the Government for reconsideration of the Court's previous decision in this matter relating to estoppel against the Government. More specifically, the Court was requested to reconsider its application of the doctrine of estoppel against the United States which resulted in the dismissal of a criminal indictment issued under the Sherman Act against the New Orleans Chapter of Associated General Contractors and its individual members. The Court recognized the general rule that estoppel is not applicable against the Government in criminal matters; however, given the particular facts and circumstances revealed during the preliminary proceedings of the case, an application of the exception to the general rule, as was stated in United States ex rel. Demarois v. Farrell, 87 F.2d 957, 962 (8th Cir. 1937), cert. den. 302 U.S. 683, 58 S.Ct. 31, 82 L.Ed. 527 was understood by this Court to be in accordance with an issue of sound, if not imperative, public policy involved in this particular case; namely, public confidence in the motives and conduct of public officials. The importance of the people's confidence in their institutions of government can never be re-emphasized too strongly, especially in a nation where government has been dedicated and re-dedicated over the years to its people.

In its attempt to show that defendants had knowledge of pending Grand Jury investigations (and thereby successfully challenge the timeliness of defendants' motion excepting to the legality of the Grand Jury), the Government introduced a letter into evidence which it had received from defendants' counsel without entering any exception

or reservation whatsoever as to the contents of the letter as a whole. The importance of this exhibit requires the Court at this time to quote verbatim from the Record at pages 18 through 21:

"MR. BECKLER (Atty., U. S. Dept. of Justice): I am not through yet.

"And in response to the letter which I have just read, I received a reply dated December 30, 1963, from Deutsch, Kerrigan & Stiles, over the signature of R. Emmett Kerrigan.

"This letter is addressed as follows:

" 'William H. Orrick, Jr., Esq., Assistant Attorney General, Anti-Trust Division, United States Department of Justice, Washington, D. C. 20530.

'Attention: Charles L. Beckler, Esq., Attorney, Department of Justice. Re: WHO:BJR:CLB 60–12–112. Our File 8776.

" 'Dear Mr. Beckler: Thank you for your letter of December 24th and its invitation to members of the New Orleans Chapter, Associated General Contractors of America, Inc., to appear before the Grand Jury. I sent a copy of your letter to the Association and have discussed its contents with its Board of Directors.

" 'Since attorneys for the contractors could not be present during their examination, the Grand Jury might not get a full and complete picture of the general contracting industry in New Orleans.

" 'As you know, these are businessmen, not lawyers. Certainly, as an experienced attorney, you will acknowledge that the most forthright witnesses—men of undoubted integrity and candor—if untrained in the art of interrogation, can become bewildered and perhaps prejudice their situation when questioned at length by veteran prosecutors in the absence of a Judge or the assistance of their own counsel. For that reason I have advised the Association to decline your invitation.

" 'I might add that it seems to us that the Government is being unnecessarily relentless in apparently seeking an indictment against many members of the New Orleans business community rather than exploring through frank discussions those policies of the Association to which your department may have some objection.

" 'Furthermore, if there should be any direct disagreement as to the propriety of any particular association procedure, certainly such questions are better resolved in the customary anti-trust injunction suit, which appears to be the standard method of testing matters of first impression. *This seems to be particularly so since the Government made a thorough investigation of the Association ten or eleven years ago and made no complaint at that time about bidding Rule C,* which requires that all items necessary to complete the job be included in the general contract, and which seems to be the primary objective of your present inquiry before the Grand Jury.

" 'The Association is willing to comply with any reasonable suggestion that would eliminate any misunderstanding about its bidding procedures. Please let me know whether you want to confer further about the matter before you reconvene the Grand Jury. I will be happy to meet with you there or in Washington.

" 'Respectfully, R. Emmett Kerrigan.'

"This is a photostatic copy, and we will supply defense counsel—

"MR. WELLER: I have attached a copy of it to my rebuttal memorandum.

"MR BECKLER: *May we submit it as our Exhibit B, and I offer it in evidence.*

"(Whereupon, the documents above referred to, marked for identification as Exhibit A and Exhibit B, were received in evidence.)" (Emphasis added).

The rules of evidence to be applied here are well-established in Louisiana jurisprudence as well as at common law. As far back as 1887, Chief Justice Bermudez of the Louisiana Supreme Court precisely summarized the applicable rule as follows:

"It is a general principle of the law of evidence, long recognized and so firmly settled as to be an axiom, that where either party litigant relies on the admissions or declarations of his adversary to make out a case against him, the whole of those admissions must be taken together as a unit, and that such party cannot select the favorable portions and repudiate the others. (citing cases) In keeping with that equitable rule of practice, the present court has declared that a party who introduces in evidence, *without qualification,* an instrument of writing, cannot be permitted to impeach or gainsay the correctness of its recitals." Kolman v. His Creditors, 39 La.Ann. 1089, 3 So. 382, 383 (S.Ct.La. 1887).

See also, Lucas v. American Bankers' Ins. Co., 141 So. 394, 397 (La.App. 2nd Cir.) (1932); Samuel Stamping & Enameling Co. v. Monroe Furniture Co., Ltd., 172 So. 217, 218 (La.App.2d Cir.) (1937).

The rule as applied in common law jurisdictions is strikingly similar, and is stated by Corpus Juris Secundum in the following language:

"In the absence of an express understanding between counsel and the court that evidence is to be limited to a particular matter, the court will be authorized to consider evidence which has been admitted for any purpose for which it is competent and relevant to the issues. A party offering evidence which is competent only for a specific purpose must request the court so to limit the evidence * * *" 88 C.J.S. Trial § 87, p. 196.

See also, Steele v. Wiedemann Machine Co., 280 F.2d 380, 383 (C.A.3) (1960).

Thus, the truth of the statements as quoted above from Mr. Kerrigan's letter and submitted into evidence, without qualification, by the Government. was and remains considered by this Court as admitted by the Government, particularly the statement that

" * * * the Government made a thorough investigation of the Association ten or eleven years ago and made no complaint at that time about Bidding Rule C, * * *" (Transcript of Proceedings at p. 20).

As was previously stated by this Court, the Government's acquiescence toward "Bidding Rule C" following its earlier and admittedly thorough examination of the Association certainly induced the defendants to continue using the same bidding procedure which the Association never attempted to conceal and of which the Government was fully aware for better than a decade.

Coupled then with established and well-recognized rules of evidence, the Court's invocation of public policy was thus considered proper in order to prohibit any allegation that the activity formerly investigated and unobjected to is now to be considered as criminal for purposes of retroactive prosecution. The concept of fairness permeates our laws, and that there remains confidence that it shall prevail is an interest to be understood as absolute.

In conclusion, the cases cited by the Government in its motion for reconsideration of judgment are readily distinguishable on the facts from the case at bar. In United States v. Borden Co., 308 U.S. 188, 60 S.Ct. 182, 84 L.Ed. 181 (1939) as well as in United States v.

Socony-Vacuum Oil Co., 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940), a special statute or regulation suspending application of the anti-trust laws to a particular activity alerted defendants that their conduct would be considered unlawful unless formal approval were obtained from the official agency charged with the administration of a certain economic program. Therefore, the Court in those cases could well say that the illegal conspiracy continued and was subject to prosecution after termination of the license that had permitted the proscribed activity. As far as the quotation in Court of Justice Holmes' language in Leach & Co. v. Peirson, 275 U.S. 120, 121, 48 S.Ct. 57, 72 L.Ed. 194, is concerned, the letter in question there was written by the plaintiff and offered into evidence by the plaintiff himself and was thus considered to be self-serving. That is quite different from the facts presented in the case at bar. Twigs should not be confused with the trunks of great trees under which they may lie.

Consequently, for the reasons stated herein, the Court's previous decision in this case is hereby reaffirmed.