**UNITED STATES of America,**

**v.**

**RICHTER CONCRETE CORPORATION et al.**

**Crim. A. No. 11700.**

United States District Court,
S. D. Ohio, W. D.

March 16, 1971.

Joseph J. Calvert, Antitrust Div., U. S. Dept. of Justice, Cleveland, Ohio, for plaintiff.

John M. Kunst, Jr., Cincinnati, Ohio, for defendant, Richter Concrete Corp.

Murray S. Monroe, Cincinnati, Ohio, for defendant, Hilltop Concrete Corp.

Lucius E. Burch, Jr., Memphis, Tenn., for defendant, Eddie K. Wilson.

## ORDER OVERRULING MOTION TO DISMISS

HOGAN, District Judge.

Three motions have been filed by the defendants in this case and in connection with at least two of them oral argument has been requested. The briefs have been examined and, in the light thereof, the oral argument request is denied.

This memorandum deals with only one of these motions, to-wit, the motion to dismiss. The motion to dismiss is based on two grounds:

The first—that the indictment fails to allege the essential facts constituting a conspiracy in unlawful restraint of trade in that it does not allege "the manner" in which the alleged violation occurred and "the essential factual allegations" in support thereof. This portion of the motion is based largely on Russell v. United States, 369 U.S. 749, 82 S.Ct. 1038, 8 L.Ed.2d 240 (1962) and United States v. Levinson, 405 F.2d 971 (6th Cir. 1968) cert. denied, etc.

The second ground—the indictment fails to allege essential facts showing a restraint of trade in or affecting interstate commerce, as distinguished from intrastate commerce or purely local commerce. This ground is based on Sun Valley Disposal Co. v. Silver State Disposal Co., 420 F.2d 341 (9th Cir. 1969); United States v. Starlite Drive-in, Inc., 204 F.2d 419 (7th Cir. 1953); Coulter Funeral Home, Inc. v. Cherokee Life Ins. Co., 32 F.R.D. 358 (E.D.Tenn.1963).

Turning to the first ground—it must be admitted that the indictment in this case, in comparison with other antitrust indictments, even in very similar fields, would place No. 1 in a brevity contest. Cf. United States v. United States Steel, 233 F.Supp. 148 (S.D.N.Y.1964); United States v. South Florida Asphalt Co., 329 F.2d 860 (5th Cir. 1964) and United States v. Metro Denver (D.C.Col.). It contains seven sections—the first being definitions, the second descriptive of the defendants, the third refers to non-defendant co-conspirators. Briefly, to summarize these: "Ready Mix concrete" is a mixture of cement and other materials widely used in the construction and improvement of various types of structures. The two corporate defendants are ready mix concrete suppliers; their mixing plants are located in the southwestern section of Ohio and they supply their product to customers in a four-county area in Southwest Ohio. The individual defendant has been associated with one of the corporate defendants in an executive capacity.

The next section, "Trade and Commerce," states that in the period 1967 to the indictment date, the defendants produced ready mix concrete and sold their product to general contractors, home builders and others on the basis of written or oral quotations rendered to the customers; that the customers used ready mix concrete in the construction, repair and improvement of highways and various types of structures; that the gross sales of the product by the two corporations in 1968 amounted to almost $10 million and that represented 65 percent of gross sales by all such suppliers in the area; that cement is the basic ingredient of ready mix concrete, represents about half of the total cost of materials used in such production and that the cement is ordered and purchased by the suppliers "on the basis of existing orders and anticipated demand for ready mix concrete"; that a substantial part of the cement purchased by the corporate defendants is produced outside of Ohio and delivered in response to the specific orders of the corporate defendants who, therefore, "act as conduits through which cement flows in a continuous uninterrupted stream in interstate commerce" from the states of origin to the defendants' production facili-

ties and thence in the product form to the job sites.

Section V deals with the offense charged and is specifically involved in the first ground. The charge is that beginning in or about 1967 and continuing to the indictment "the defendants and co-conspirators entered into and engaged in a combination and conspiracy *in unreasonable restraint of the aforesaid interstate trade and commerce in the sale of ready mix concrete in the Cincinnati area*" in violation of the Sherman Act; that the combination and conspiracy "consisted of a continuing agreement, understanding, and concert of action among the defendants and co-conspirators to raise and stabilize the price of ready mix concrete in the Cincinnati area."

The sixth section describes some specific effects "among others." Those effects are a restraint on price competition in the sale of ready mix concrete in the Cincinnati area; a deprivation of the opportunity to purchase ready mix concrete in an open and competitive market in the Cincinnati area; and, finally, the increase in price and market stabilization in the same area.

The seventh and last section deals with jurisdiction and venue.

The defendants correctly point out that an indictment must charge all of the essential elements of the alleged offense with sufficient fullness, clarity and particularity (a) to advise the accused of the nature of the accusation against him in order that he might prepare his defense, and (b) to permit him to plead a judgment of acquittal or conviction in bar to a subsequent prosecution. This much is required, of course, by the Fifth and Sixth Amendments and Criminal Rule 7(c). It must, in the language of *Levinson,* supra, not only state the specific statutory violation alleged, it must also state the manner in which the alleged violation occurred and the essential factual allegations in support thereof.

As noted inferentially above, in antitrust indictments, even those based on per se violations, it certainly has been the custom and the practice to not only charge the per se violation but to go further and get into at least some specifics of how the per se violation was to be carried out. The Government has referred us to no situation comparable to this case in which an indictment rests simply on the per se charge.

■ There is some claim in the defendants' brief that a charge of "to raise and stabilize the price" is not a per se charge. We disagree. To stabilize and raise means, we think, to hold the fort where it is and once the holding position has been established, to sally forth and upward. See United States v. Container Corp., 393 U.S. 333, 89 S.Ct. 510, 21 L.Ed.2d 526 (1969); United States v. Socony Vacuum Oil, 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129 (1940). To either stabilize or raise is "to tamper" with the price structures as they did exist under unrestrained competition and an agreement to tamper, or an agreement to stabilize, or an agreement to raise is, in this Court's view, merely a charge of a per se violation.

It may well be that the "core of the alleged offense in a prosecution for failing to answer a question before Congress is the pertinency of the offense to the Congressional inquiry in which the question is asked" (Russell v. United States, supra) and/or that "manner" of execution is a sine qua non of an indictment under the General Conspiracy Section (18 U.S.C. § 371)—(United States v. Levinson, supra). However, see Glasser v. United States, 315 U.S. 60, 62 S. Ct. 457, 86 L.Ed. 680 (1941)—

"The particularity of time, place, circumstances, causes, etc. of effecting the object of a conspiracy * * * is not essential to an indictment."

However, and certainly in the per se field, it has consistently been recognized, since Nash v. United States, 229 U.S. 373, 33 S.Ct. 780, 57 L.Ed. 1232 (1913)

that "the answer is that the Sherman Act punishes the conspiracies at which it is aimed on the common-law footing—that is to say, it does not make the doing of any act other than the act of conspiring a condition of liability."

■ This section of this motion presents squarely the question whether or not a Sherman Act indictment, unquestionably sufficient in its statements of the specific statutory violation involved, and unquestionably sufficient in respect of time and place, and unquestionably sufficient (in this Court's view) in alleging a per se violation, must go further and contain some allegation of the manner in which the agreement or conspiracy was to be carried out. In this Court's view, the answer to the question is in the negative. The offense would be complete when the agreement which constitutes a per se violation, i. e., agreement to work together to tamper with price, is made. Whether the detail was worked out at the same time or later would remain a detail and not an "essential element."

■■ Turning to the second ground —which also is certainly substantial— the argument is this: There must, of course, be a substantial relationship between some interstate commerce and the per se agreement, i. e., the per se agreement must be, either directly or by necessary implication, directed toward interstate commerce (i. e., operate on or affect). A purely local effect, even coupled with a per se price-fixing agreement, would not satisfy the jurisdictional requirements of a Sherman Act proceeding (e. g. Starlite, supra). The Grand Jury has elected to set forth specific "Effects" in this indictment in Section VI and those specified are all eo nomine local, since they are all confined to the Cincinnati area and confined to the effects of the agreement on the sale—not of cement—but of ready

mix concrete which contains at the most 50 percent of a material which moved in interstate commerce to the mixer. The "overall" end product is described as containing a "substantial" part of the interstate cement, which might mean as little as 10 percent [1] (presumptively, the balance is intrastate cement).

The leading cases on the subject are Mandeville Island Farms v. American Crystal Sugar Co., 334 U.S. 219, 68 S. Ct. 996, 92 L.Ed. 1328; and Las Vegas Merchant Plumbers Ass'n v. United States, 210 F.2d 732 (9th Cir. 1954; cert. denied, etc.). See also United States v. Women's Sportswear Manufacturers Ass'n., 336 U.S. 460, 69 S.Ct. 714, 93 L.Ed. 805; United States v. South Florida Asphalt Co., 329 F.2d 860 (5th Cir. 1964, cert. denied, etc.); Sun Valley Disposal Co. v. Silver State Disposal Co., 420 F.2d 341 (1969); Bailey's Bakery v. Continental Baking Co., 235 F. Supp. 705 (D.C.Hawaii, 1964).

In *Mandeville* the restraint was exercised before any movement of anything in interstate commerce and at an intrastate level. What has become a very long and involved set of principles was summed up in one sentence at 334 U.S. page 228, 68 S.Ct. at page 1002:

"This very nearly denies that sugar beets contain sugar."

Ready mix concrete unquestionably *does* contain cement and even though the alleged restraint be at the other terminal, one must look further. This does require an inquiry, at least preliminarily, into the involved set of principles. They are gathered under the so-called "in commerce" theory and under the so-called "affects interstate commerce" theory. The "conduit" allegations of the indictment deal with the former. As was recognized in Walling v. Jacksonville Paper, 317 U.S. 564, 63 S.Ct. 332, 87 L.Ed. 460—

1. The suggested 10 percent, if conduit-ed, can "feel the pinch" of an "in commerce" restraint. The illegality is related, in an "in commerce" context to "the character of the restraint, not the amount of commerce affected." United States v. Socony Vacuum Oil, supra, 310 U.S. at page 225, 60 S.Ct. at page 845.

A situation could arise where shipments made in anticipation of needs of specific customers, rather than on prior orders or contracts, might be sufficient to establish that practical continuity in transit necessary to keep a movement of goods in commerce. The test has been described as "qualitative" rather than "quantitative."

■ The indictment charges that a substantial part of the cement used by the corporate defendants is (a) produced in states other than Ohio, and (b) is ordered and purchased based on specific orders and anticipated demand. The Grand Jury has, in its indictment, set forth a course of business which, if proven, could well satisfy the requirements of the "in commerce" theory. The conduit allegations in this indictment are similar to those in *Las Vegas Merchant Plumbers Ass'n.*, supra, and sufficiently allege a flow of cement in interstate commerce in substantial amounts from the producer to the eventual consumer; or stated otherwise, sufficiently negate the departure from interstate commerce and into local activity of cement from the time it is initially shipped until it is delivered to the customers of the corporate defendant.

■ In respect of the "affects" theory, the problem is somewhat complicated by reason of the omission of a pertinent allegation in the Effects section, being Section VI. However, the "interstate movement" of "a substantial part of the cement purchased by the corporate defendants is used in the production of ready mix" is adequately described in Section IV and thereupon, in Section V, the Grand Jury described the combination and conspiracy to be "in unreasonable restraint of the aforesaid interstate trade and commerce." In at least one circuit, not the Sixth, the statement in an indictment of an effect upon interstate commerce has been held as simply conclusory. However, this Court has concluded to follow the 9th Circuit cases of Las Vegas Merchant Plumbers and Chrysler Corporation (United States

v. Chrysler, 180 F.2d 557 (9th Cir. 1950)). See also United States v. South Florida Asphalt Co., supra, specifically 329 F.2d at page 867:

"When we look to the four corners of the information, as was done in Chrysler, supra, the phrase 'herein-before-described commerce' has reference to interstate commerce. The bitumen that is used in the Broward County area has unquestionably been in interstate commerce. If the allegations of the complaint are proven, the alleged acts of the appellees will have an adverse effect on such commerce."

The "affects" theory has been described as involving a question of fact whether the intrastate activities affect interstate commerce in a substantial, as distinguished from an incidental, manner. (Las Vegas Merchant Plumbers Ass'n, supra, 210 F.2d at page 748.) The indictment charges the ultimate fact. The defendants' positions related to the "only 65%" and "10% of 50% is not substantial" involves determinations of fact, not questions of sufficiency of an indictment. The indictment does allege that a substantial part of the cement purchased is received in interstate commerce and that that interstate commerce is affected. The allegations themselves are sufficient. Whether the Government can prove it or not is another question. Of course, this Court in looking to Section V as a charged effect is following a well established principle that the indictment is to be looked at as a whole.

The motion to dismiss is therefore overruled. The remaining pending motions in this case will be considered and decided at the earliest available time.

## ORDER ON DEFENSE MOTIONS

a) For Production of Records of Grand Jury Vote and Voting Procedures and to Dismiss Indictment as to any defendant not Voted on by the Grand Jury

b) For Discovery and Inspection of Impounded Documents

■ FIRST—with respect to the motion for discovery and inspection of impounded documents—the United States in its "reply" thereto proposed the entry of an order attached to the reply. In the defendants' reply memorandum of March 1, 1971, no opposition is made to that proposal. As a consequence, the order as proposed by the United States has been signed and will be entered this date, fixing the objection date of April 1, 1971.

SECOND—in the Grand Jury motion, the defendants suggest that the Fifth Amendment and Criminal Rule 6 require (a) that the proposed indictment be actually drawn and actually submitted to the Grand Jury subsequent to which the vote of the Grand Jury must be taken; that a determination and vote to present, followed by the preparation of the indictment, followed by only the signature of the foreman is not sufficient. This is based on Gaither v. United States, 134 U.S.App.D.C. 154, 413 F.2d 1061 (1969); and (b) that if it is proposed in a single presentment or indictment to deal with more than one defendant, the various persons or entities to be dealt with must be voted upon separately by the Grand Jury. No specific authority is advanced for this second proposition.

This Court has made an "in camera" examination of the record kept by the Grand Jury which returned this indictment of "the number of jurors concurring in the finding" and filed with the Clerk in accordance with Criminal Rule 6(c). Suffice to say that the record indicates on its face that in excess of the required number concurred in the finding. That record does not indicate on its face whether or not the vote was taken after the actual submission of the indictment to the Grand Jury or whether or not the three defendants were voted upon separately.

Be that as it may, the motions of the defendants are overruled for these reasons:

a) Insofar as the Gaither point is concerned, the United States in its reply memorandum "represents to the Court that the procedures used in the District of Columbia which were the subject of criticism in the Gaither case were not followed in the present matter; the Grand Jury had the instant Indictment before it for deliberation and vote; and the Indictment which the Grand Jury returned * * * is the same Indictment which the Grand Jury considered and voted upon."

b) For the reasons set forth in United States v. Jeffries, 45 F.R.D. 110 (D.C.1968). In the last analysis Gaither amounted to an exercise by the District of Columbia Circuit of its supervisory powers. The Sixth Circuit has not so done —at least as yet.

c) For the traditional reasons respecting the secrecy of grand jury proceedings denying inspection "in the absence of a strong and positive showing that an indictment * * * was presented in violation of constitutional rights." There is no showing of any such here by the defense. See United States v. Johnson, 319 U.S. 503, 63 S.Ct. 1233, 87 L.Ed. 1546 (1943).

Furthermore, the defense motions are directed toward the "most secret" part of the grand jury's activity. Rule 6 on its face provides that while certain persons may be present at other times, "no person * * * may be present while the grand jury is * * * voting."

This case is assigned for a pretrial hearing on April 13, 1971, at 10:00 a. m. At least one week in advance thereof each party hereto will file and serve on the other parties a list of items which would be proposed for discussion at that said pretrial, supported by any memorandum any party wishes to file.