The **UNITED STATES of America,** Plaintiff-Appellee,

v.

**Benjamin LEVINSON, Franklin Mortgage Corporation, Edward P. Strang, Jr., Ross Howard, Defendants-Appellants.**

**Nos. 18204–18207.**

United States Court of Appeals Sixth Circuit.

Dec. 30, 1968.

Edward Bennett Williams, Washington, D. C., Patrick M. Wall, Washington, D. C., Donald E. Shely, Donald S. Young, Dykema, Wheat, Spencer, Goodnow & Trigg, Detroit, Mich., on brief, for appellant Strang.

William I. Liberson, Detroit, Mich., Cyril Abramson, Detroit, Mich., of counsel, for Ross Howard.

Joseph W. Louisell, Detroit, Mich., Ivan E. Barris, Detroit, Mich., on brief, Lawrence I. Levi, Orville J. Thill, Frank M. Wiseman, Detroit, Mich., Neil Howard Fink, Louisell & Barris, Detroit, Mich., of counsel, for Benjamin Levinson and Franklin Mortgage Corp.

Marvin R. Loewy, Sp. Atty., Department of Justice, Washington, D. C., Lawrence E. Gubow, U. S. Atty., Robert J. Grace, Asst. U. S. Atty., Detroit, Mich., on brief; Lafayette E. Broome, Mark M. Richard, Attys., Department of Justice, Washington, D. C., Russell M. Paquette, Chief Atty., Veterans Administration, Detroit, Mich., of counsel, for appellee.

Before PHILLIPS and PECK, Circuit Judges, and CECIL, Senior Circuit Judge.

CECIL, Senior Circuit Judge.

Edward P. Strang, Jr., Ross Howard, Franklin Mortgage Corporation and Benjamin Levinson, defendants-appellants herein, appeal from judgment of conviction in the United States District Court for the Eastern District of Michigan. The essence of the offense of which the appellants were convicted, as charged in the first count of the indictment, was a conspiracy to defraud the United States through the Veterans Administration, an agency of the United States, by preventing the Veterans Administration from having its loan guaranty program administered in accordance with the provisions of Section 1801 et seq., Title 38, U.S.C. and the rules and regulations promulgated thereunder. Although the indictment contained 33 counts, the trial judge severed counts 26 through 33 from the instant trial. The substantive offenses charged in counts 2 through 25 of the indictment stem from the alleged conspiracy in the first count.

In addition to the appellants herein, Richard David Mitchell, Richard E. Medinis, Thomas Whitford and Rem Realty Company, a Michigan corporation, were also indicted in the first count of the indictment. Robert Cerwin, an employee of Franklin Mortgage Corporation, was named as a co-conspirator but was not indicted. Rem Realty Company became defunct as a corporation and was dismissed before trial. Richard E. Medinis pleaded guilty and Thomas Whitford was dismissed at the close of the government's case. Richard David Mitchell was convicted but is now deceased.

Counts 2 to 5, 8 to 10 and 12 to 15 charged Levinson, Franklin, Strang, Mitchell, Medinis, Rem Realty and Howard with specific violations of Section 1001,[1] Title 18, U.S.C. Counts 6, 7, 16 and 17 charged Levinson, Franklin and Howard with specific violations of Section 1001. Count 11 charged Levinson, Franklin and Strang with a violation of Section 1001. Counts 18 and 19 charged Medinis, Mitchell, Rem Realty and Whitford with specific violations of Section 1001. Counts 20 to 25 charged Mitchell, Medinis and Rem Realty with violations of Section 1001. The severed counts of the indictment, Nos. 26 through 33, involve similar conspiracy and substantive offenses relative to the loan program of the Federal Housing Administration (FHA).

The case was tried before a jury and all of the defendants, except Whitford, Rem Realty and Medinis, were convicted on all of the counts of the indictment. The trial judge sentenced Franklin to pay a $10,000 fine, and sentenced Levinson, Strang and Howard each to pay a $10,000 fine and to 18 months' imprisonment

---

1. "Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than five years, or both."

upon their pleas "of not guilty and verdict(s) of guilty of the offense of conspiracy; false statements to obtain VA loans; aiding and abetting; in violation of Sections 371, 1001 and 2, Title 18, U.S.C., as charged in the indictment; * * *."

The Veterans Administration's home loan program is based upon Section 1801 et seq., Title 38, U.S.C., and the regulations promulgated thereunder. The statutory plans provide for the issuance by the VA of guaranties on mortgage loans made to veterans. To participate in this program a veteran must have been discharged under other than dishonorable conditions and have served a minimum of ninety days' service. Section 1810(b) states that no loan may be guaranteed unless

"(1) the proceeds of such loan will be used to pay for the property purchased, constructed, or improved;

"(2) the contemplated terms of payment required in any mortgage to be given in part payment of the purchase price or the construction cost bear a proper relation to the veteran's present and anticipated income and expenses;

"(3) the veteran is a satisfactory credit risk;

"(4) the nature and condition of the property is such as to be suitable for dwelling purposes;

"(5) the price paid or to be paid by the veteran for such property, or for the cost of construction, repairs, or alterations, does not exceed the reasonable value thereof as determined by the Administrator; and

"(6) if the loan is for repair, alteration or improvement of property, such repair, alteration, or improvement substantially protects or improves the basic livability or utility of such property."

Loans may be guaranteed on either the "automatic basis" or the "prior approval basis." Section 1802(d) provides for the issuance of automatic guaranties on loans made by "supervised lenders." A "supervised lender" is generally any financial institution, insurance or mortgage and loan company that is subject to "examination and supervision" of an agency of the federal or a state government. Wayne National Life Insurance Company qualified as a "supervised lender" because it was an insurance company subject to the supervision of the Michigan Insurance Commissioner. It is the responsibility of the supervised lender to determine whether the loan meets the requirements of the statute and regulations. Section 1032, Veterans Administration Regulations.

Unlike supervised lenders, whose loans are automatically guaranteed by the VA, "non-supervised lenders" must seek guaranties on the "prior approval basis." A "non-supervised lender" is one that is not subject to the supervision of a federal or state agency. Franklin Mortgage Corporation was a non-supervised lender. Under the "prior approval basis" of obtaining guaranties, the VA, not the lender, makes the final determination as to whether or not the loan comports with all statutory and regulatory requirements. The VA would make this determination on the basis of the pertinent information required to be submitted to it by the lender. If the loan is held to qualify, the VA so notifies the lender who then closes the loan and submits the loan to the VA who issues its guaranty.

The benefits of obtaining guaranties on the automatic basis are twofold. It relieves the VA of the necessity of making a detailed and lengthy study of the loan application to see if it qualifies for a guaranty. This responsibility is assumed by the supervised lender who certifies that "the loan conforms otherwise with the applicable provisions of 38 U.S.C., Chapter 37, and of the regulations concerning guaranty of insurance of loans to veterans." Because the VA does not make the determination of eligibility, the guaranties are issued much sooner than if the application had been submitted on a prior approval basis.

■ Appellants Strang and Howard contend that the conspiracy count of the

indictment, Count one, is defective and insufficient and should have been quashed. Both of these appellants made pretrial motions to this effect which were denied by the trial judge. The decisions of the Supreme Court make it clear that a valid indictment must fulfill two distinct functions. First, an indictment must inform the accused of the nature of the charges against him, with such specificity and particularity that the accused is enabled to undertake and prepare an adequate defense. Second, an indictment must be so framed that it should be evident to what extent a plea of double jeopardy is available to the accused in the event of future charges involving similar offenses. United States v. Debrow, 346 U.S. 374, 74 S.Ct. 113, 98 L.Ed. 92; Hagner v. United States, 285 U.S. 427, 52 S.Ct. 417, 76 L.Ed. 861; Russell v. United States, 369 U.S. 749, 82 S.Ct. 1038, 8 L.Ed.2d 240.

■■ Although an indictment is subject to careful examination to assure conformity with the strict requirements mentioned above, not all lapses from precision and correctness require that an indictment be quashed. Non-prejudicial errors and defects do not invalidate indictments which otherwise fulfill the two prime requisites of informing the accused of the nature of the charge and defining the scope of a future plea of double jeopardy. Smith v. United States, 360 U.S. 1, 79 S.Ct. 991, 3 L.Ed.2d 1041; Williams v. United States, 341 U.S. 97, 71 S.Ct. 576, 95 L.Ed. 774. The essence of this principle is found in Rule 52(a) of the Federal Rules of Criminal Procedure which states that "Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded."

■■ Rule 7(c) of the F.R.Crim.P. provides that "The indictment * * * shall be a plain, concise and definite written statement of the essential facts constituting the offense charged." In addition to stating the specific statutory violation alleged, the indictment must indicate the manner in which the alleged violation occurred and the essential factual allegations in support thereof. An indictment which does not mislead the accused as to the nature of the offense charged, enables him to prepare an adequate defense and is specific enough to prevent future prosecutions for the same offense, is valid in spite of any minor deficiencies or technical errors.

■ Count one of the indictment charged the defendants with a violation of Section 371, Title 18, U.S.C., the general conspiracy section. Section 371 provides:

"If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both."

This section provides criminal sanctions for two distinct types of conspiratorial action. The first, involving a conspiracy to "commit any offense" against the United States, concerns conspiracies having as their object the commission of unlawful acts subject to criminal prosecution or suit for penalty. United States v. Hutto, 256 U.S. 524, 41 S.Ct. 541, 65 L.Ed. 1073. The second prong of the general conspiracy section, involving a conspiracy "to defraud the United States," includes conspiracies having as their purpose impairing, obstructing or defeating the lawful function of any department of government. Haas v. Henkel, 216 U.S. 462, 30 S.Ct. 249, 54 L.Ed. 569.

■■ Count one of the present indictment charges that the defendants "* * * did in violation of Title 18, U.S.C., Section 371, unlawfully, wilfully, knowingly and feloniously conspire between and among themselves, and with others to the Grand Jury unknown, to commit offenses against the United States of America, to-wit: to defraud the United States of Amer-

ica, in particular the Veterans Administration, an agency of the United States of America, of its right to have its loan guaranty program administered in accordance with the provisions of Section 1801, et seq., Title 38, United States Code, and the rules and regulations promulgated thereunder, and to violate Section 1001, Title 18, United States Code."

This indictment is admittedly artlessly framed by charging defendants with a conspiracy to commit the offense of defrauding the United States by failing to adhere to the provisions of Section 1801 et seq. Section 1801 et seq. does not create a substantive criminal offense or provide a penalty for failure to follow its prescriptions. Thus if the indictment is read literally under the "offense" portion of Section 371 a conspiracy to committ an "offense" is not properly alleged. But such a literal reading of the indictment does damage to the plain and obvious meaning it was intended to impart. It is obvious that what was meant to be charged was a conspiracy to defraud the United States. The words "to commit offenses against the United States of America, to-wit:" are, in regard to this portion of the indictment, mere surplusage and can be ignored. United States v. Vazquez, 319 F.2d 381 (C.A. 3). "The insertion of surplus words in the indictment does not change the nature of the offense charged." Bridges v. United States, 346 U.S. 209, 223, 73 S.Ct. 1055, 1063, 97 L.Ed. 1557. See also, Bary v. United States, 292 F.2d 53 (C.A. 10); United States v. Chunn, 347 F.2d 717 (C.A. 4). These words, which are surplusage with respect to the "defraud" portion of the indictment, more properly belong with the part of the indictment which charges defendants with conspiring to "violate Section 1001, Title 18, United States Code." Count one of the indictment makes it evident and clear that the defendants are charged with a conspiracy to defraud the United States and to commit offenses against the United States in violation of Section 1001, Title

18, U.S.C. There can be no misunderstanding of the nature of the charges and consequently no resulting prejudice to the defendants.

Appellants further argue that the portion of Count one charging a conspiracy to violate Section 1001, Title 18, U.S.C. is insufficient because it merely cites the substantive crime which was the object of the alleged conspiracy. If all that Count one of the indictment contained was a simple allegation that defendants conspired to violate a particular provision of the criminal code, appellants' position would be correct. However paragraph four of Count one states that

"It was a further part of said conspiracy that the defendants would submit and cause to be submitted, the following loan documents and reports, among others, to the Veterans Administration * * * which loan documents contained false and fraudulent statements. * * *"

This paragraph defines that portion of the conspiracy dealing with the violation of Section 1001.

Appellants challenge the sufficiency of paragraph four arguing that it merely alleges what was done instead of what was agreed to be done. However paragraph four specifically alleges that as part of the conspiracy the defendants "would submit, and cause to be submitted," false and fraudulent documents.

The statement in the indictment that the defendants conspired to defraud the United States "of its right to have its loan guaranty program administered in accordance with the provisions of Section 1801, et seq., Title 38, United States Code, and the rules and regulations promulgated thereunder" is a clear and definite statement of the governmental function which the defendants allegedly conspired to obstruct and impair. We hold that the indictment is not vague or ambiguous and thus satisfies the requirements of the Sixth Amendment.

The following statement by the Supreme Court in United States v. Debrow, supra, at 377–378, 74 S.Ct. at 115, is

relevant to the alleged insufficiency and invalidity of the present indictment:

"The charges of the indictment followed substantially the wording of the statute which embodies all the elements of the crime, and such charges clearly informed the defendants of that with which they were accused, so as to enable them to prepare their defense and to plead the judgment in bar of any further prosecutions for the same offense. It is inconceivable to us how the defendants could possibly be misled as to the offense with which they stood charged. The sufficiency of the indictment is not a question of whether it could have been more definite and certain. If the defendants wanted more definite information as to the name of the person who administered the oath to them, they could have obtained it by requesting a bill of particulars. Rule 7(f), F.R.Crim.Proc."

We hold that the indictment is sufficient and does not violate the Fifth or Sixth Amendments to the Constitution.

It is claimed on behalf of Strang that his constitutional rights were violated by denying him the right to counsel in the grand jury room during his interrogation; that government counsel failed to advise him of his right to counsel before testifying and to have counsel present outside the grand jury room for purposes of consultation; and that he was subpoenaed and questioned without giving notice to his counsel. It is argued that because of these violations the indictment should be dismissed as to Strang either because of the alleged constitutional violations or by reason of the Court's supervisory power over federal law enforcement. The question was raised by a motion before trial to dismiss the indictment. The motion was denied.

The appellant, Edward P. Strang, Jr., was president of Wayne National Life Insurance Company. It was the arrangement between Wayne and Franklin, which we will hereinafter discuss, that gave rise to the conspiracy and other charges herein involved. Strang while under investigation of the charges for which he was later indicted was called to testify before the grand jury concerning the case about which he was being investigated.

It appears from the record before us that Strang had a conversation with Mr. Barton W. Morris, assistant United States Attorney, before entering the grand jury room and was advised that anything he said could be used against him and that he did not have to testify to anything that might incriminate him. The same admonition was given to him in the grand jury room after he was sworn. In his conversation with Mr. Morris, Strang asked if he could have his lawyer with him in the grand jury room and was told that he could not. Before entering the grand jury room Strang knew what the investigation was about and of the possible involvement of himself and Wayne. For some time prior to his appearance before the grand jury he had consulted with five lawyers and there is evidence that he knew for two days that a subpoena had been issued for him to testify before the grand jury. Before entering the grand jury room Strang requested and received permission to make a telephone call.

It has been recognized that a potential defendant may be subpoenaed to testify before a grand jury. United States v. Clearly, 265 F.2d 459 (C.A. 2), cert. den. 360 U.S. 936, 79 S.Ct. 1458, 3 L.Ed.2d 1548; United States v. Winter, 348 F.2d 204 (C.A. 2), cert. den. 382 U.S. 955, 86 S.Ct. 429, 15 L.Ed.2d 360. See also, United States v. Luxenberg, 374 F.2d 241 (C.A. 6). Rule 6(d) F.R.Crim.P. provides:

"Attorneys for the government, the witness under examination, interpreters when needed and, for the purpose of taking the evidence, a stenographer or operator of a recording device may be present while the grand jury is in session, but no person other than the jurors may be present while the grand jury is deliberating or voting."

It has never been held except in Sheridan v. Garrison, 273 F.Supp. 673 (E.D.La.), that a witness, whether a potential defendant or not, has a constitutional right to have a lawyer present with him in the grand jury room. The grand jury is an ancient institution and the only agency of our jurisprudence that is secretive. Its proceedings are not adversary. Its function is only investigative. It does not determine guilt or innocence. It determines only whether there is sufficient evidence to cause an accused to stand trial before a petit jury. There is no right of an accused to cross-examine witnesses or to introduce evidence in rebuttal. The grand jury has in all ages stood between the accused and his unjust accusers. One accused of crime may oftentimes, by himself testifying before the grand jury, clear up the charges against him so that no indictment is returned. Strang told Mr. Morris that he would testify voluntarily and may well have had the hope that he could explain his part in the Wayne-Franklin affair.

Admittedly *Escobedo, Miranda* and *Wade* [2] are not factually analogous to Strang's position in the case at bar. We are unwilling to extend the principle of those cases to the right of a potential defendant to have a lawyer present with him in the grand jury room. There are other means of protecting a defendant from abuse of power of a prosecutor or from a violation of constitutional rights.

There was no obligation on the part of the government counsel to notify Strang's counsel that Strang was subpoenaed before the grand jury. Strang himself had ample opportunity to do that. He was never denied the right to have his lawyer accompany him to the door of the grand jury room and to have him wait outside while he was testifying. He was given permission to use the telephone before going into the grand jury room and he was free to have called his lawyer then if he wished to consult with him.

Prior to trial, appellant Strang filed a motion under Rule 6(e) [3] of the F.R. Crim.P. to inspect the minutes of the Grand Jury. In support thereof Strang stated:

"On December 27, 1965, defendant filed a Motion to Dismiss, in which he alleged violation of his constitutional rights, both with respect to the Grand Jury Proceedings which led to the founding of the Indictment and to the Indictment itself, and in which he alleged that the form and manner in which he was questioned before the Grand Jury prejudiced him in the eyes of the Grand Jury, thereby inducing the return of the indictment against him. Such Motion to Dismiss is hereby incorporated in this Motion."

The motion to dismiss alleged that Strang's constitutional rights "not to be a witness against himself" and to "have the assistance of counsel for his defense" were violated. The statement in his motion for inspection of the grand jury minutes concerning the manner in which he was questioned before the grand jury is taken almost verbatim from the motion to dismiss. The government submitted the transcript of Strang's appearance before the grand jury to the trial judge for an *in camera* inspection. The judge denied the motion. On appeal Strang only assigns as error the refusal

2. Escobedo v. Ill., 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977; Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694; United States v. Wade, 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149.

3. "Disclosure of matters occurring before the grand jury other than its deliberations and the vote of any juror may be made to the attorneys for the government for use in the performance of their duties. Otherwise a juror, attorney, interpreter, stenographer, operator of a recording device, or any typist who transcribes recorded testimony may disclose matters occurring before the grand jury only when so directed by the court preliminarily to or in connection with a judicial proceeding or when permitted by the court at the request of the defendant upon a showing that grounds may exist for a motion to dismiss the indictment because of matters occurring before the grand jury."

of the trial judge to permit inspection of his own testimony before the grand jury.

The government concedes that under present Rule 16(a)(3),[4] effective July 1, 1966, the defendant would have been entitled to make such an inspection. However, the trial of this case was begun prior to the effective date of amended Rule 16, and is governed by the then prevailing law. Only upon a showing of a "particularized need" by a defendant, may a trial court intrude upon the secrecy of the grand jury proceedings and permit inspection of its minutes. Pittsburgh Plate Glass Co. v. United States, 360 U.S. 395, 79 S.Ct. 1237, 3 L.Ed.2d 1323, rehearing den. 361 U.S. 855, 80 S.Ct. 42, 4 L.Ed.2d 94; Dennis v. United States, 384 U.S. 855, 86 S.Ct. 1840, 16 L.Ed.2d 973. The rule requiring a demonstration of a "particularized need," prior to July 1966, applied equally to testimony of the defendant himself as well as other witnesses. It is within the trial judge's discretion to grant or deny a request for inspection of grand jury minutes and a denial of such a request is reversible only if the trial judge abused his discretion.

Nothing in the grand jury minutes would shed any light on Strang's contention that he was denied his constitutional right to counsel before the grand jury. It is undisputed that he did not have one in the grand jury room with him when he was testifying. His request concerning counsel made to the prosecutor and the prosecutor's response thereto were not part of the grand jury proceedings and would not be contained in the minutes. It is also undisputed that the prosecutor advised Strang, outside of the grand jury room, of his right not to incriminate himself. The trial judge quoted the applicable portion of the grand jury minutes wherein Strang was advised of his right not to incriminate himself in his memorandum opinion overruling Strang's motion to quash the indictment. No additional information concerning the alleged violation of his right not to be a witness against himself could be gleaned from inspecting the minutes.

Other than the mere conclusory statement in both the motion to dismiss the indictment and the motion to inspect the grand jury minutes that the form and manner in which Strang was questioned before the grand jury was prejudicial, there is nothing to support such an assertion.

Under these circumstances we think that no "particularized need" was demonstrated which would permit the trial judge to allow an inspection of the testimony of Strang before the grand jury. The resolution of the issue was within the discretion of the trial judge and we hold that his discretion was not abused.

We consider next the question of the sufficiency of the evidence raised by appellants Strang and Howard. Because of the complicated and involved nature of the transactions with which we are concerned, it is necessary to present the following somewhat detailed statement of facts.

Franklin is a Michigan Corporation, located in Detroit, whose business is the processing, closing and servicing of real estate mortgages, principally those insured by the FHA or guaranteed by the VA. Levinson is its president and major stockholder. Howard, who began working for Franklin in September, 1962, had the title of Executive Assistant. Cerwin, one of the principal government witnesses, became vice-president of Franklin in February, 1962. Franklin, as a "non-supervised" lender, was only able to secure VA guaranties on the prior approval basis. In 1962, and prior thereto, Franklin was having difficulty in getting guaranties on some of the loan applications it submitted to the VA because the veterans were poor credit risks. In

---

4. "Upon motion of a defendant the court may order the attorney for the government to permit the defendant to inspect and copy or photograph any relevant * * * (3) recorded testimony of the defendant before a grand jury."

early 1962, Cerwin met with Paul Kelly, head of the loan guaranty division of the Detroit VA office, in Kelly's office. Kelly told Cerwin that some of Franklin's loans were poor risks and requested Franklin not to burden the VA with such unnecessary work.

In 1962 Franklin became aware of the process of obtaining VA guaranties on an "automatic basis." Thereafter it entered into accommodation arrangements with "supervised" lenders who could automatically secure VA guaranties. Under these arrangements Franklin would process loan applications and submit them to the supervised lender who would make an independent check of the application to see if it conformed with the applicable statutes and regulations, and to determine if the veteran was a satisfactory credit risk. Upon approval of the loan, the loan would be closed by the "supervised" lender who would apply for an "automatic" guaranty from the VA. After receiving the guaranty, the supervised lender would assign the mortgage back to Franklin. Such accommodation arrangements, wherein the "supervised" lender made an independent check of the veteran's credit and qualifications, were not illegal prior to June, 1963.

The "supervised" lenders were rejecting some of the loans submitted to them by Franklin and indicated to Franklin that they would not renew their arrangements and commitments after the expiration of their terms. In August, 1962, Kelly wrote a long letter to Levinson dealing with Franklin's deficiencies in connection with submissions to the VA of 48 cases submitted through a supervised lender. Because Franklin needed new "automatic" sources through which to process VA loans, Levinson directed Howard to seek out supervised lenders who would be interested in entering into such accommodation arrangements.

In early December, 1962, Howard contacted Edward P. Strang, President of Wayne National Life Insurance Company, a small company with its office in Detroit, Michigan. Harold Bayer was General Counsel of Wayne, an officer, and a member of the Board of Directors and the finance committee. Kenneth Koppin was Executive Vice President of Wayne and managed the everyday affairs of the company. After Howard explained to Strang that Wayne could process VA mortgages on an automatic guaranty basis, Howard arranged a meeting between Strang and Levinson.

In mid-December, 1962, Strang met with Levinson, Howard and Cerwin at Franklin's offices. The nature of the VA loan guaranty program was explained to Strang and discussed. A subsequent meeting was held several days later. It was agreed at these meetings that Franklin would originate and process approximately $200,000 worth of loans to be made by Wayne who would submit them to the VA for automatic guaranties. After receiving the guaranty, Wayne would assign the loans to Franklin. Wayne would receive a 1% fee on the closing and a 1½% fee on the assignment of the loan to Franklin. A contract dated December 20, 1962, and signed by Strang on behalf of Wayne, and Levinson on behalf of Franklin, outlined several portions of the agreement between the parties. The government has not contended and does not contend that this written agreement violates the law.

Cerwin testified that it was agreed between Wayne and Franklin that Wayne's sole task was to supply the money and obtain the VA guaranty in its name, and that Franklin would attend to all the details, including the credit check. Strang's statement which he made to the FBI is to the same effect. Levinson disagreed with this characterization of the arrangement and testified that it was his understanding that Wayne would perform the credit analyses as did the other supervised lenders with whom Franklin had accommodation arrangements.

On December 21, 1962, Strang, in agreement with Koppin, discussed the desireability and legality of the contract with Bayer. Strang informed Bayer of the nature of the agreement and the VA loan guaranty program. According to

Strang, he submitted the matter to Bayer for his review and approval. However, Strang neglected to inform either Koppin or Bayer that he had already signed the agreement with Franklin on the preceding day. Furthermore, he did not inform them that he had also signed a letter, dated December 21, 1962, to Levinson authorizing Franklin to close 22 loans at 91% of par.

In order to submit loans to the VA through Wayne, Levinson contacted Mitchell of Rem Realty and told him to bring down some business as Franklin had a new source who could secure guaranties on the automatic basis. Rem Realty Company was a Michigan corporation whose main business was to buy old houses in the run-down inner city area and try to sell them to veterans in hopes of obtaining a VA loan guaranty. Mitchell and Medinis were the principal stockholders of Rem, but because of their prior involvement with bankrupt operations, had others pose as the officers and directors of Rem. Rem falsified the credit reports of veterans in the hope that the applications would then be accepted for a VA guaranty. Cerwin who was present when Levinson telephoned Mitchell, testified that Levinson told Mitchell that the new source for VA guaranties "would take anything" regardless of the credit of the veterans, including "derogs." "Derogs" is a term used in the mortgage business to refer to derogatory or poor credit risks. Mitchell told Medinis to take all VA cases, regardless of anything, over to Levinson. Medinis and Mitchell brought approximately 12 to 15 cases to Franklin's office, which they characterized to Cerwin and Dorothy Stuart, Cerwin's secretary, as bad risks and "garbage," another term in the mortgage business meaning poor credit risks. Cerwin told Levinson that the Rem loans were poor credit risks and that Franklin was looking for trouble if they submitted them to the VA. Levinson ordered Cerwin to process them anyway. Levinson denied everything except telling Mitchell to bring in some cases as they had a new source.

Approximately 22 loans, 15 of which were from Rem, were "closed" between December 26th and December 31, 1962. The loans were closed at the offices of Burton Abstract Company. Inasmuch as Wayne had not yet authorized the disbursement of funds to cover the loans, the closing papers were signed by the respective parties and held in escrow by Burton. The "closings" were most unusual in that they were completed before the loans were processed and before they were submitted to a "supervised" lender for an independent credit check and approval. The papers for the "closing" were all prepared at the offices of Franklin. In connection with the submission of the loans to the VA, false information concerning the credit of the veterans was prepared and the signatures of numerous veteran borrowers and Strang were forged. Dorothy Stuart, Cerwin's secretary, testified that both Cerwin and Howard directed her to sign the names of Strang and the veteran borrowers to various documents that were thereafter submitted to the VA. She was further told by both Cerwin and Howard that Strang had authorized the signing of his name. Howard and Cerwin denied this.

A partial disbursement of Wayne funds was made by check dated January 4, 1963, and negotiated on January 7th, both prior to any formal approval of the loans by Bayer. Contrary to Strang's intimations, this initial disbursement was prior to any authorization by Bayer. Koppin signed the check at his home where it had been brought by Nancy Murray, a Wayne secretary, and Howard. Koppin testified that he signed the checks on the assurances of Strang that it was a transaction separate from the Franklin arrangement and involved "good" mortgages. He further stated that had he known that the check was in connection with the Franklin arrangement he would not have signed it because Bayer had not yet given his approval. This disbursement was made out of additional funds Wayne had available for investment.

On January 8, 1963, after the loans had been closed in escrow and after an initial

disbursement had been made thereon, Cerwin and another Franklin employee, brought the files of the cases to Bayer's office. Cerwin testified that Strang, who arrived shortly after he did, made the statement that they were going to go through the motions of approving the loans. At this meeting and one held the following day, Bayer would not authorize the disbursement of Wayne funds unless Franklin executed an unconditional agreement to buy back any mortgage that the VA refused to guarantee. Cerwin said such an agreement was satisfactory but that Levinson had to sign it. Thereupon Bayer authorized the disbursement of funds to cover the first group of closed loans. Levinson at first signed the agreement, but thereafter excised his signature. When Bayer learned of this, he wrote Strang and advised him that he was not in favor of this arrangement with Franklin unless they had such an agreement and questioned whether Franklin was the "type of company we wish to do business with." Howard later signed a buy-back agreement telling Bayer that he was not an officer of Franklin and that he had no authority to sign the agreement. Bayer then authorized the disbursement of the balance of the funds, and never formally revoked his authorization.

Sometime in January, 1963, Levinson suggested to Strang that an extra point be paid upon the closing of the loan. Levinson testified that Mitchell told him that Rem was very anxious to close the deals and would be willing to pay an extra point to expedite the matter. Strang agreed and told Levinson to pay part of the extra-point moneys to him personally and part to the First Fidelity Corporation, a family-owned corporation of which Strang was a major stockholder.

Late in January and early February 1963, the first loan packages were sent to the VA for its guaranties. Franklin made the actual submissions but accompanied them with a covering letter on Wayne stationery. Strang had sent Wayne stationery over to Franklin's office, and told Dorothy Stuart to contact his secretary when she needed more. In early February 1963, the VA approved Wayne as a "supervised lender" under its guaranty program. At this point the VA was not aware of Franklin's interest in the loans. An examination of the loan packages by the VA indicated that most were poor credit risks and the proper standards had not been followed. Seven of the 22 applications submitted by Wayne were rejected by the VA.[5] Kelly, loan guaranty officer at the Detroit office of the VA, asked another employee to arrange for Strang to come to their office and discuss the loan program. Strang declined to go but sent his personal secretary, Arnold Tunesi. Howard accompanied him. Strang told Howard not to reveal that Howard was associated with Franklin. Howard introduced himself at the VA as "Mr. Ross." A VA official lectured Tunesi and Howard about the bad credit risks being submitted by Wayne. This meeting was followed by a letter to Strang, three weeks later, explaining in detail the objections of the VA and warning that if Wayne's performance did not improve, it would be placed on a "prior approval" basis.[6]

On March 1, 1963, Strang resigned as President of Wayne, but remained on its Board of Directors and its Finance Committee.

It is apparently conceded by all that conviction on the substantive counts of the indictment is contingent upon a find-

5. The VA's rejection of seven of Wayne's applications for guaranties was based on the following statement from the Veterans Administration Lenders Handbook, Section 1032:

 "In the absence of fraud or material misrepresentations, the VA will not substitute its judgment for the lender's as to the credit risk assumed in any par-

ticular case nor question the validity of a guaranty already issued."

6. "If after a reasonable period the lender fails to demonstrate satisfactory performance, consideration will be given to the possibility of requiring prior approval for all future loans." Veterans Administration Lenders Handbook, Section 1032.

ing that the appellants were members of a conspiracy and that the acts which are the subject of the substantive charges were committed in furtherance of the conspiracy. It is conceded that there are false and fraudulent statements contained in the documents submitted to VA.

Strang contends that the agreement between Wayne and Franklin was not illegal and therefore he could not be guilty as charged. The government concedes that accommodation arrangements between "supervised" and "non-supervised" lenders were not inherently illegal at the time of the transactions involved herein.[7] The government does not contend that the written agreement dated December 20, 1962, between Franklin and Wayne violates the law. Rather it is the government's position that Levinson, Franklin, Howard, Strang and the other conspirators went beyond the bounds of legal action and conspired to defraud the United States of the lawful operation of its VA home loan guaranty program by submitting to the VA for automatic guaranty, through Wayne, a "supervised" lender, loans which the parties knew did not meet the requirements of Section 1801 et seq. and the rules and regulations promulgated thereunder.

 Appellants Strang and Howard contend that there is insufficient evidence to support the jury's verdicts of guilty.[8] An appellate court's function in reviewing the verdict of a jury is very limited. We do not sit as a trier of fact and will not enter into a de novo consideration of the evidence. The verdict of the jury cannot be reversed if there is substantial evidence to support the findings of guilt. Glasser v. United States, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680; United States v. Knight, 336 U.S. 505,

69 S.Ct. 704, 93 L.Ed. 845. In considering the sufficiency of the evidence, we do not determine whether it establishes guilt beyond a reasonable doubt, but only that the evidence would permit the triers of facts to find the defendants guilty beyond a reasonable doubt. Ramsey v. United States, 248 F.2d 740 (C.A. 6); United States v. Ragland, 306 F.2d 732 (C.A. 4) cert. den. 371 U.S. 949, 83 S.Ct. 504, 9 L.Ed.2d 498. In considering the sufficiency of the evidence in a criminal case, we must construe the evidence most favorably to the government. Glasser v. United States, supra. This includes the drawing of all reasonable inferences and reasonable credibility determinations favorable to the government. Glasser v. United States, supra; United States v. Decker, 304 F.2d 702 (C.A. 6). To do otherwise would usurp the prerogatives of the jury.

 The following quotation from the Court's opinion in United States v. Luxenberg, supra, at pp. 249–250, concerning knowledge of and participation in a criminal conspiracy is relevant to the questions raised by appellants herein on the sufficiency of the evidence:

"Knowledge, like intent, is a factual issue which may be proved by circumstantial evidence. Whether a conspiracy exists is likewise a factual question * * * It is not fatal to the prosecution's case that it does not prove that the defendants knew or participated in every phase of the unlawful scheme. (Citations omitted.) It is only necessary that a defendant know of the conspiracy, associate himself with it, and knowingly contribute his efforts in its furtherance. (Citations omitted.) Participation in a conspiracy

---

7. In a general information letter dated June 1, 1963, the VA stated:
 "The V.A. has re-examined its position and has determined, as a matter of administrative policy, that the interest of the Government and of lenders and veterans will be best served by requiring supervised lenders to discontinue the closing of loans on the automatic basis in those instances where such closing would be for the accommodation of a non-supervised lender, i. e., closing under the automatic procedure will have the effect of enabling the non-supervised lender to do indirectly what it may not do directly."

8. Levinson does not argue the sufficiency of the evidence.

need not be proved by direct evidence. '(A) common purpose and plan may be inferred from a "development and collocation of circumstances."' (Citations omitted.) It is not necessary that there be a formal agreement in order to have an unlawful conspiracy. (Citations omitted.) 'Almost always, the crime is a matter of inference, deduced from the acts of the persons accused, which are done in pursuance of an apparent criminal purpose.'" (Citations omitted.)

▮ Applying those principles to the evidence that was before the jury, we conclude that there was sufficient evidence to support the jury's verdicts of guilty against Howard and Strang. Howard was the one who introduced Levinson to Strang, and made the initial contact with Wayne. He was present at the initial meeting between Levinson and Strang. According to Dorothy Stuart's testimony, Howard directed her to sign the names of the veterans applying for loans and of Strang. Howard accompanied Nancy Murray to Koppin's house where Koppin signed a check dated January 4, 1963, under misleading representations. Howard eventually signed the buy-back agreement requested by Bayer. Further, Howard accompanied Tunesi to the VA offices where he introduced himself as "Mr. Ross" to avoid making known his relation to Franklin. There is further evidence that Howard visited at least one veteran who had not yet occupied the home involved and threatened him with criminal prosecution if he did not move in.[9] He also arranged for certain mortgages to be kept current by bringing checks to the veterans for their endorsement, which checks were then recorded by Franklin as mortgage payments.[10] This evidence, together with all the other evidence presented to the jury, is sufficient to support the guilty verdict entered against Howard.

▮ If the evidence relative to Strang merely supported a finding of imprudent business practices or acumen, the jury would not have been warranted in returning a verdict of guilty against him. However, this was not the case. Strang signed the agreement with Franklin on December 20, 1962, and thereafter attempted to secure the approval of Wayne's general counsel without informing him that he had already executed it. A letter dated December 21, 1963, and signed by Strang, gave Franklin permission to close 22 loans at a time when no one at either Franklin or Wayne had made a proper credit check. Furthermore, 22 loans were closed before the end of the year, prior to securing Bayer's approval of the arrangement. Cerwin testified that Strang said that he was going through the motions of approving the loans. Strang personally signed some of the reports sent to the VA which stated that the loans met the requirements of the statute and regulations, when in fact they did not and when Strang hardly examined the files. Strang arranged for the partial disbursement of funds by check, dated January 4, 1963, by misleading Koppin as to the purpose for which the funds were required. Strang supplied Franklin with Wayne stationery and told Dorothy Stuart to contact his secretary when she needed more. Strang told Howard to conceal his connection with Franklin when Howard accompanied Tunesi to the VA's offices. Strang personally, and a corporation of which Strang was a major stockholder, profited on the extra point Rem Realty agreed to pay. This evidence taken in conjunction with the other evidence before the jury is sufficient to support its finding of Strang's guilt.

Appellants Levinson, Franklin and Strang contend that the trial judge committed reversible error in permitting the government, over objection, to elicit testimonial evidence concerning trans-

9. The VA regulations require that a veteran occupy the home on which a guaranty is sought.

10. By keeping the payments up to date, appellants were trying to prevent the government from contending that the loans were bad.

actions involving the FHA. The evidence concerned the false and fraudulent obtaining of FHA mortgage insurance on two loans previously rejected by the VA which were the subject of counts 26 to 33 of the indictment. These counts were severed from the trial in the instant case. However other aspects of these two loans involving veterans Reese and Spates, were the subject of several substantive counts of the indictment which were submitted to the jury.

 Strang contends that the evidence was inadmissible because it concerned matters and dealings with which he had no connection and because the acts were committed subsequent to the termination of the conspiracy with which he was allegedly connected. Strang relies on the well settled principle of law that the declarations of a co-conspirator made after the termination of the conspiracy and not in furtherance thereof are admissible only against the declarant and not against the other alleged conspirators. See, Krulewitch v. United States, 336 U.S. 440, 69 S.Ct. 716, 93 L. Ed. 790. While *Krulewitch* may apply to declarations of conspirators, the case does not govern evidence of acts of co-conspirators committed subsequent to the termination of the alleged conspiracy which are admissible if relevant to prove the conspiracy and which demonstrate its existence and illegal purposes. Lutwak v. United States, 344 U.S. 604, 73 S.Ct. 481, 97 L.Ed. 593, rehearing den. 345 U.S. 919, 73 S.Ct. 726, 97 L.Ed. 1352. Cerwin's testimony was relevant to prove the aims of the conspirators and the manner in which similar frauds were perpetrated and as such were admissible against all appellants.

 Appellants Levinson and Franklin argue that the admission of such testimony was contrary to the trial judge's original order severing counts 26 through 33 from the trial herein and was extremely prejudicial to their positions. The mere granting of a severance does not thereafter preclude a trial judge from admitting evidence relating to crimes which are the subject of the severed counts of an indictment if such evidence satisfies the applicable rules of relevancy to the issues of the case on trial. As indicated above such evidence was clearly admissible.

We hold that the trial judge did not abuse his discretion and thereby commit error in permitting Cerwin to testify concerning the securing of FHA mortgage insurance on the Reese and Spates loans.

During the course of the trial, over the objection of Franklin's and Levinson's counsel, F.B.I. Agent Bolton testified to the substance of an oral statement made to him by their co-defendant Strang and the government introduced into evidence the unsigned copy of the statement itself. Prior to Bolton's testimony and the receipt of the statement into evidence, the judge cautioned the jury that both the written and oral statements were admissible against Strang only and could not be considered against any of the other co-defendants. Appellants Franklin and Levinson contend that the trial judge committed reversible error in not sustaining their objections to such evidence. Strang's statements were not confessions of guilt. Levinson and Franklin characterize them as exculpatory as to Strang and extremely inculpatory as to themselves. Levinson and Franklin object to those portions of Strang's statements which indicate that Levinson and Franklin agreed to assume full responsibility for examining and approving mortgages as far as credit was concerned, on behalf of Wayne and that Levinson, Howard and Cerwin had forged his signature on letters and documents submitted to the Veterans Administration.

 In support of their position, appellants Franklin and Levinson rely primarily on the recent Supreme Court decision in Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476. *Bruton,* in overruling Delli Paoli v. United States, 352 U.S. 232, 77 S.Ct. 294, 1 L.Ed.2d 278, held that a defendant's right to cross-examination may be violated by the introduction into evidence, in a joint trial, of a co-defendant's in-

criminating extra-judicial statements. In the circumstances of that case, the Supreme Court held that cautionary instructions by the judge to the jury could not eliminate the substantial prejudice to the petitioner. In Roberts v. Russell, 392 U.S. 293, 88 S.Ct. 1921, 20 L.Ed.2d 1100, the Supreme Court held that the *Bruton* rule was retroactive. But *Bruton* clearly recognized that "(n)ot every admission of inadmissible hearsay or other evidence can be considered to be reversible error unavoidable through limiting instructions * * * It is not unreasonable to conclude that in many such cases the jury can and will follow the trial judge's instructions to disregard such information." Bruton v. United States, supra. Cautionary instructions are impotent to overcome those situations in which there is great risk that the jury will not or cannot abide by the judge's instructions to the detriment of the defendant's vital interests. The Supreme Court characterized the statement of Bruton's co-defendant as "powerfully incriminating."

▇▇▇ Strang, like *Bruton's* co-defendant, did not take the stand. Contrary to Franklin's and Levinson's assertions it cannot be said that the allegedly inculpatory portions of Strang's oral and written statements had a devastating effect on the minds of the jurors. Franklin and Levinson argue that Strang's extra-judicial statements regarding Levinson's and Franklin's alleged assumption of complete responsibility for checking credit "was unequivocally the most damaging information reaching the jury box concerning the appellants Levinson and Franklin Mortgage." However the case may be, the record is replete with other evidence and testimony to the same effect. Cerwin testified that at a meeting attended by Levinson, Strang and himself, Levinson agreed on behalf of Franklin to assume the responsibility in regards to making an analysis of the credit. The testimony of Dorothy Stuart, a secretary and clerk at Franklin, further indicates that Franklin closed

loans without first submitting the papers to Wayne for processing. Medinis testified that when Levinson called him he told him that all Medinis' applications for mortgages would be approved "regardless of anything." Cerwin corroborated this testimony and further testified that after both he and Medinis commented on the poor quality of the applications, Levinson ordered Cerwin "to go ahead and process them anyway." Other evidence and testimony further supports the view that Franklin and Levinson knew that a good number of applications were from extremely poor credit risks and that Wayne would not and could not make a credit check, but relied upon the office of Franklin to perform the check.

Levinson argues that Strang's statements to the effect that he "did not authorize Levinson, Howard, Cerwin or anyone else to sign my signature" implied that Levinson was guilty of such wrongdoing. In view of the other evidence presented at the trial, little weight must be given to this argument. Dorothy Stuart testified that she signed Strang's name to various documents at the insistance of Cerwin and Howard. Furthermore, because of the fact that Strang's signature was required on various documents sent directly by Franklin to the Veterans Administration, it must be assumed that someone at Franklin had directed the signing of Strang's name on the documents.

In view of the fact that Strang's statements added little, if anything, to a record replete with similar and corroborative evidence, it cannot be said that the cautionary instructions accompanying the admission into evidence of Strang's oral and written statements was insufficient to eliminate any possible prejudice to Franklin and Levinson. Furthermore, we conclude that the admission of such statements, even if it be considered error, was harmless beyond a reasonable doubt. Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705, rehearing den. 386 U.S. 987, 87 S.Ct. 1283, 18 L.Ed.2d 241.

■ Contrary to appellants Levinson's and Franklin's contentions we hold that it was proper for the trial judge to permit testimony concerning the practices of prudent lenders in the Michigan area. Such testimony was relevant because it provided the background information concerning the transactions with the VA, explained the procedures used in the Detroit VA office and established the effect or materiality of the allegedly false statements contained in· the documents submitted to the VA.

■ Strang contends that the trial judge committed error in failing to instruct the jury as he requested with respect to the conspiracy count. The government presented its case on the basis of a single conspiracy which had as its purpose the defrauding of the United States and the violation of Section 1001, Title 18, U.S.C. Strang's theory was that there was not one over-all conspiracy, but that there were actually two separate and distinct conspiracies, one, to avoid the statutory and regulatory requirement that the supervised lender exercise its independent judgment as to the qualifications of the loan and the other to submit false statements concerning the loan applications to the VA. Strang contended that even if he was a member of the first conspiracy, he was not and could not be connected with the second. In accordance with this position, Strang requested the trial judge to charge the jury that if Strang was a member of only one prong of the conspiracy and not a member of the over-all conspiracy, Strang should be acquitted on Count one of the indictment. The trial judge agreed with the government's contention that this was a single conspiracy aimed at thwarting the lawful operation of the VA home loan guaranty program. The government submitted the case on this basis, the court instructed the jury on this basis, and there was more than sufficient evidence to support the jury's implicit finding of a single conspiracy. The trial judge believed that no evidence was presented which warranted an instruction of a mul-tiple conspiracy charge as requested by Strang. He stated:

"I think I indicated I saw no evidence of any secondary agreement. There is one conspiracy here or there isn't any. At least that is my conclusion from the testimony."

We have carefully reviewed the entire record in this case and hold that the trial judge was correct in denying Strang's request for a multiple conspiracy charge.

■ We find no merit to Strang's claim that the trial judge did not properly instruct the jury on the defense of advice of counsel. It is questionable that he was entitled to any instruction on that defense. Admittedly Strang did not fully advise his counsel as to all of the circumstances of the transaction and he signed the agreement on December 20th before he consulted his lawyer. It was not the contract itself which was illegal but the conduct under it, of which counsel was not fully advised, that constituted the conspiracy. On December 21, 1962, prior to obtaining any approval of Wayne's General Counsel, Strang signed a letter authorizing Franklin to close 22 loans.

■ Appellants Strang, Levinson and Franklin contend that reversible error resulted from the trial judge's refusal, in his charge, to read, explain and interpret pertinent regulations of the VA concerning the home loan guaranty program. The pertinent regulations were read to the jury numerous times during the course of the trial. Defense counsel referred to them extensively during opening statements and closing arguments. Kelly of the VA was on the witness stand for nine days during which time he was examined and was examined extensively on the meaning of the regulations. The "Lenders Manual," published by the VA, was introduced into evidence and was available to the jury during its deliberations. The trial judge referred to and quoted several parts of the VA's regulations and manual in his charge to the jury. The meaning and substance of the regulations were ade-

quately before the jury and the trial judge did not err in denying Strang's, Levinson's and Franklin's requested instructions concerning the interpretation and meaning of the regulations. No claim is made, and none can be made, that the trial judge improperly instructed the jury on the elements necessary to find appellants guilty of conspiracy and the various substantive offenses charged.

Judgment affirmed.